# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| LIVE WELL FINANCIAL, INC., | Case No. 19-11317 (LSS) |
| Debtor. | **Hearing Date: 9/10/2020 at 2:00 p.m. (ET)**<br>**Objections Due: 8/25/2020 at 4:00 p.m. (ET)** |

**MOTION OF CHAPTER 7 TRUSTEE FOR APPROVAL OF
LITIGATION SUPPORT AND ALIGNMENT AGREEMENT BY AND BETWEEN
DAVID W. CARICKHOFF, IN HIS CAPACITY AS CHAPTER 7 TRUSTEE FOR
THE ESTATE OF LIVE WELL FINANCIAL, INC., AND MIRAE ASSET
SECURITIES (USA) INC., PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND
RULE 9019(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

David W. Carickhoff, the chapter 7 trustee (the "Trustee") of Live Well Financial, Inc. (the

"Debtor"), hereby moves (this "Motion") for approval pursuant to sections 105(a) and 363(b) of

title 11 of the United States Code, 11 U.S.C. §§ 101–1532 *et seq.* (as amended, the "Bankruptcy

Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

of a *Litigation Support and Alignment Agreement* entered into by the Trustee and Mirae Asset

Securities (USA) Inc. ("Mirae" and, together with the Trustee, collectively, the "Parties") on

August 10, 2020 (the "Agreement").[1]  A copy of the Agreement is annexed as Exhibit 1 to the

proposed order attached hereto as Exhibit A (the "Proposed Order").  In support of this Motion,

the Trustee respectfully states as follows:

## PRELIMINARY STATEMENT

1.    The Trustee has reached an agreement with Mirae, one of the Estate's largest

creditors, in order to maximize recoveries for all of the Estate's creditors.  Mirae and the Trustee

have claims against certain of the prime actors responsible for the publication of grossly inflated

---

[1] Capitalized terms used, but not defined in the Motion have the meanings ascribed to such terms in the Agreement.

valuations of bonds owned by the Debtor.  Recoveries on these aligned and related claims will be maximized if the Trustee and Mirae agree to a joint representation by a single special counsel in respect of one set of these aligned claims.  If a single counsel is used to press these claims, administrative efficiencies will be achieved through a coordinated litigation effort.  Further, the compromise allows the Estate to enhance its chances of recovery on all of the aligned claims by creating a single distributional waterfall from which Mirae and the Estate will be paid.  This waterfall enables a fair and, in the view of Mirae and the Trustee, mutually advantageous risk-sharing.  The Agreement is a cornerstone to the Trustee's litigation program, which is commencing at present on various fronts.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper pursuant to U.S.C. §§ 1408 and 1409.[2]

3.      The bases for the relief requested in this Motion are sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

---

[2] Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Trustee consents to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the Parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

**A.     The Bond Mismarking.**

4.      Prior to filing for bankruptcy, the Debtor operated as a financial services company providing reverse mortgages and forward mortgages to customers, servicing mortgages, and trading in mortgage backed securities.

5.      Between 2014 and 2019, the Debtor held a portfolio of certain bonds, each entitling the holder to receive a portion of the interest payments, but not principal payments, from a particular pool of reverse mortgages (the "Bonds").  The Debtor initially purchased twenty Bonds at a cost of approximately $50 million (but the Debtor ultimately expanded its Bond portfolio to approximately fifty Bonds before its business collapsed).

6.      The Debtor financed its acquisitions of these Bonds and then in turn further levered the Bonds to create additional liquidity by borrowing money or otherwise obtaining financing from various lenders and other counterparties through a series of financing and/or repurchase agreements and secured loans in which the Bonds served as collateral or as sale property.  In respect of these transactions, the fair market value of the Bonds dictated how much money the Debtor's lenders and counterparties were willing to lend or otherwise fund to it.

7.      The Debtor employed a third-party pricing service, Intercontinental Exchange, Inc., as successor in interest to Interactive Data Corporation (together with its wholly-owned, indirect subsidiary Interactive Data Pricing and Reference Data LLC, collectively, "ICE"), to publish independent valuations of the company's Bonds, which Mirae relied on exclusively for valuation of the Debtor's Bonds.

8.      As a well-known provider of security valuation services to investment companies, investment advisers, broker-dealers, financial services companies, insurance companies, banks, trust companies, and other institutional investors, many of the Debtor's lenders relied upon ICE to

3

value the Bonds serving as collateral for their loans to the Debtor.  In fact, ICE was the only pricing service available for Debtor's Bonds until November 2018, and was specified as the primary pricing source in repurchase agreements through which Debtor obtained financing for the Bonds, including a repurchase agreement with Mirae.

9.      However, in 2015 or 2016, at the direction of Michael C. Hild, the Debtor's CEO, ICE appears to have stopped independently auditing the valuations it published for Debtor's Bonds and began inaccurately marking the Bonds at grossly inflated prices (the "Bond Mismarking").

10.      The Bond Mismarking caused the Debtor's lenders to provide it with financing that was substantially in excess of the actual market value of its Bonds, saddling the Debtor with loans well beyond its ability to repay or refinance.  However, it was highly lucrative for Hild, funding lavish compensation packages (including more than $24 million in additional salary, bonuses, and other special compensation) and allowing him to buyout other preferred shareholders to become majority shareholder of the Debtor and control one of two seats on its board of directors.

11.      Over time, the Debtor's lenders reduced the amount of credit they were willing to extend to the Debtor and, by March 2018, the Debtor was financing its portfolio of Bonds through just two repurchase lenders:  Mirae and Industrial and Commercial Bank of China Financial Services LLC ("ICBC").  The Debtor also maintained a Bond-secured credit facility with Flagstar Bank, FSB ("Flagstar") at or around this time.

12.      Ultimately, the Debtor's business collapsed in May 2019, after Mirae and ICBC realized that the Bonds were worth substantially less than their published values and demanded repayment of the funds that they had loaned to the Debtor.

13.     Because the Debtor had been loaned far more than the actual worth of its Bonds as a direct consequence of ICE's inflated valuations, it could not repay its lenders by selling the Bonds or refinancing.  On May 3, 2019, the Debtor announced that it was winding down its operations.

> **B.**     **The Debtor's Bankruptcy.**

14.     On June 10, 2019 (the "Petition Date"), certain creditors of the Debtor, including Mirae, ICBC, and Flagstar (collectively, the "Petitioning Creditors"), filed an involuntary petition under chapter 7 of the Bankruptcy Code against the Debtor in this Court.

15.     The Petitioning Creditors have asserted unsecured, non-priority claims against the Debtor's Estate in an aggregate amount of $176,911,501.48 for losses resulting in part from the Bond Mismarking, including $22,964,797.19 asserted by Mirae.

16.     On July 1, 2019, the Court entered the Order for Relief.  On that same date, the Trustee was appointed as the chapter 7 trustee of the Debtor's Estate pursuant to section 701(a) of the Bankruptcy Code.

> **C.**     **The Trustee's Investigation.**

17.     Following his appointment and in consultation with the Petitioning Creditors, the Trustee began conducting a preliminary investigation of the Debtor's Estate and its assets, including certain causes of action against various entities.

18.     The Trustee and his professionals have reviewed the Debtor's books and records; performed due diligence into related civil and criminal proceedings pending against the Debtor and/or members of its executive suite respectively captioned *SEC v. Live Well Financial, Inc.*, Civ. No. 19-8086 (S.D.N.Y.), and *United States v. Hild*, Crim. No. 19-602 (S.D.N.Y.); served Bankruptcy Rule 2004 discovery on Hild and related parties and entities; and begun to analyze the Estate's causes of action in order to develop a path forward to maximize value to the Estate and its stakeholders.

19. In connection with his investigation, the Trustee has identified certain Aligned Claims under chapter 5 of the Bankruptcy Code and otherwise applicable law as possibly colorable claims belonging to the Estate, including claims against ICE and other entities, such as:

a. Certain of the Debtor's former preferred stockholders (relating to consideration given to them under a Stock Purchase Agreement they entered into with the Debtor on September 30, 2016);

b. Certain other entities engaged in finance activities in respect of the Debtor's Bonds (relating to recoveries they received substantially in excess of the recoveries received by similarly situated lenders, including Mirae);

c. Certain pre-petition professional firms employed by the Debtor; and

d. Current or former officers, directors, managers, members, partners, employees, agents, assigns, insiders, successors, subsidiaries, parents, or affiliates of each of the foregoing entities.

20. In addition, as a result of the Bond Mismarking and the Petitioning Creditors' reliance on ICE's valuations of the Debtor's Bonds, the Trustee has determined the Petitioning Creditors, and specifically, Mirae, may also have colorable claims against ICE.

21. Accordingly, the Trustee engaged in good faith, arm's-length discussions with the Petitioning Creditors regarding the potential benefits of coordinating their litigation efforts against ICE. As a result of those discussions, the Trustee and Mirae have agreed that it would be reasonable, value-maximizing, and efficient for them to be jointly represented by Reid Collins & Tsai, LLP ("Special Litigation Counsel") for such purposes.[3]

22. The Parties documented the terms of this arrangement in the Agreement annexed as Exhibit 1 to the Proposed Order. As discussed more fully below, the Agreement provides for

---

[3] Accordingly, the Parties have agreed to the terms of a letter engaging Special Litigation Counsel to represent them for purposes of prosecuting the Aligned Claims. Concurrently with the filing of this Motion, the Trustee is filing an application requesting the Court approve his employment of Special Litigation Counsel on the terms set forth therein.

6

the Parties to investigate and litigate the Aligned Claims in a single, coordinated effort and allocates the net proceeds of the Aligned Claims fairly among the Parties.

## SUMMARY OF PROPOSED COMPROMISE

23.     The material terms[4] of the Agreement include the following:

    a.     <u>Aligned Claims</u>:  Each Estate Aligned Claim and each Mirae Aligned Claim shall remain the respective property of such Party and shall be asserted by such Party in any civil action.  Neither the Estate Aligned Claims nor the Mirae Aligned Claims shall be transferred, assigned, sold, or encumbered without the prior written consent of the Parties; provided, however, for the avoidance of doubt, (i) the Mirae Aligned Claims shall not, under any circumstances, be transferred, assigned, or sold to the Trustee or the Estate, (ii) the Mirae Aligned Claims may be transferred, assigned or sold without the prior written consent of the Trustee in connection with the sale or transfer of all or a substantial portion of the business of Mirae (regardless of the legal form), provided, however that if Mirae Aligned Claims are so transferred, assigned or sold they shall remain subject to the Agreement unless the Agreement is terminated in accordance with section 9 thereof; (iii) the Trustee reserves the right to abandon Estate Aligned Claims consistent with his fiduciary duty to the Estate, but only upon further order of the Court; and (iv) Mirae reserves the right to terminate the Agreement in accordance with section 9 thereof.  The gross proceeds from the Aligned Claims (whether obtained through litigation, settlement or otherwise) during the term of the Agreement, shall be referred to, in the aggregate, as the "<u>Litigation Proceeds</u>."

    b.     <u>Special Litigation Counsel</u>:  Special Litigation Counsel shall represent each of Mirae and the Trustee in respect of the Aligned Claims pursuant to the engagement letters attached to the Agreement as Exhibit I (joint representation) and Exhibit II (Trustee representation).  The Trustee may retain Special Litigation Counsel to represent the Estate in connection with causes of action other than Aligned Claims; provided, however, that Special Litigation Counsel shall not represent the Estate in respect of matters that may be adverse to the interests of Mirae.  The Trustee's employment of Special Litigation Counsel shall be subject to prior approval of the Court after notice and the submission of a retention application by the Trustee consistent with Exhibits I and II and applicable law and rules.  Special Litigation Counsel shall provide the Parties with periodic, written status reports in respect of Aligned Claims and shall convene a monthly teleconference to brief the Parties on the status of the Aligned Claims,

---

[4] In the event of any inconsistency between the description of the Agreement contained in this Motion and the terms of the Agreement, the terms of the Agreement shall govern and control.

including, without limitation, their investigation process in respect of such Claims and related matters.  The Trustee may require Special Litigation Counsel to make further reports to the Parties on the status of Aligned Claims.

c.    Distributions of Litigation Proceeds:  The Trustee is the Distribution Agent in respect of Litigation Proceeds.  Subject to Mirae's rights of consent pursuant to section 6(ix), the Trustee shall determine when distributions can be made in respect of Litigation Proceeds, including, without limitation, interim distributions in respect of the Subject Trustee Commission and the Distribution Agent Fee (each as set forth below) and the items set forth in sub-sections (i), (ii), and (iv)(x) of section 4 of the Agreement.  All distributions under the Agreement, interim or otherwise, shall be subject to (a) the Trustee's commission for Estate disbursements, calculated as set forth in Bankruptcy Code section 326 as to all Litigation Proceeds derived from Estate Aligned Claims (the "Subject Trustee Commission"), and (b) the Trustee's Distribution Agent fee, calculated as set forth in Bankruptcy Code section 326 as to all Litigation Proceeds derived from Mirae Aligned Claims (the "Distribution Agent Fee" and collectively with the Subject Trustee Commission, the "Trustee Fees").  Once the Trustee Fees have been deducted from Litigation Proceeds, then the Trustee shall make distributions in the following order:  (i) first, (x) to Mirae as repayment of any amounts advanced by Mirae as expenses in connection with the litigation of all Aligned Claims (y) to the Trustee on behalf of the Estate, in respect of any Estate funded expense retainer and amounts advanced by the Trustee as expenses in connection with the Litigation of all Aligned Claims, and (z) to all Special Litigation Counsel costs and expenses relating to Aligned Claims (subject to any required allowance in respect of Estate Aligned Claims by order of the Court) (collectively sub-sections (x), (y) and (z) are the "Litigation Expenses"); (ii) second, to the amount of Special Litigation Counsel's Court approved contingency fee, which for the avoidance of doubt, shall be the percentage agreed by the Parties with Special Litigation Counsel applied to the Litigation Proceeds; (iii) third, to any fees and expenses of the Trustee's other professionals, but only to the extent that such fees and expenses (x) arise directly from investigation, prosecution and/or disposition of the Aligned Claims incurred after the Agreement Effective Date and subject to an agreed budget, and (y) are approved and allowed by order of the Court (collectively with the Trustee Fees and the fees set out in sub-sections (i), (ii) and (iii), the "Litigation Fees"); and (iv) fourth, (x) fifty percent (50%) of the Litigation Proceeds minus the Litigation Fees to Mirae, and (y) fifty percent (50%) of the Litigation Proceeds minus the Litigation Fees to the Estate, which Litigation Proceeds under sub-section (iv)(y) of section 4 of the Agreement shall be distributed by the Trustee pursuant to applicable bankruptcy law, rules and procedures, including, without limitation, under Bankruptcy Code sections 503, 507 and 726 (for the avoidance of doubt, Mirae shall be entitled to receive its respective *pro rata* share of sub-section (iv)(y) distribution on

account of its allowed claims; provided, however, that its allowed claims will be adjusted for any receipt of proceeds of Estate Aligned Claims by Mirae pursuant to sub-section (iv)(x) of section 4 of the Agreement). The Trustee shall be subject to the same protection under applicable law in making distributions of section 4 of the Agreement as he is entitled to under applicable bankruptcy law and his liability for any error, omission or negligence (but not the Trustee's gross negligence or willful misconduct) shall be subject to Estate indemnity and limited to the value of Estate assets.

d.    Other Trustee Duties and Powers:  The Trustee will be authorized, in Trustee's sole discretion, without prior approval from (but with reasonable prior notice to) Mirae, in Trustee's capacity as Distribution Agent under the Agreement, to approve ministerial matters in respect of the investigation or prosecution of Aligned Claims, including, without limitation:  (i) requests for extensions of time and deadlines; (ii) the filing or defense of any non-dispositive motions, including, without limitation, in respect of investigation or discovery matters; and (iii) the incurrence of ordinary course investigation and litigation professional expenses and costs payable by the Estate, up to $10,000 per instance (subject to the budget governed by and under sub-sections 6(iii)–(iv) of the Agreement) on behalf of the Parties in respect of the Aligned Claims.  For the avoidance of doubt, Mirae shall not be responsible for ordinary course investigation and litigation professional expenses unless explicitly consented to and agreed by Mirae, prior to any such expenditure. The Trustee shall convene the Parties to discuss a Material Decision (defined in section 6 of the Agreement) and may prepare an agenda for such discussion by electronic mail as a notice under the Agreement.  Such discussions will take place by teleconference or as the Trustee may otherwise specify.  Nothing contained in the Agreement shall condition, impair, or delegate the Trustee's fiduciary duty to the Estate and Trustee may act in a manner freely consistent with that duty.

e.    Material Decisions:  Any decision that is not a ministerial matter under section 5 of the Agreement and that materially relates to or impacts any Aligned Claim is a "Material Decision" and Material Decisions include, without limitation:  (i) adjustments to the compensation or the termination of Special Litigation Counsel in respect of its service to the Parties relating to the Aligned Claims; (ii) the commencement of any Aligned Claim; (iii) the establishment of a budget by Special Litigation Counsel and other Trustee professionals in respect of the investigation, prosecution or appeal of any Aligned Claim; (iv) the incurrence of investigation and litigation professional expenses and costs (a) in excess of $10,000 per instance, or (b) in excess of the budget described in sub-section 6(iii) of the Agreement, on behalf of the Parties in respect of the Aligned Claims; (v) the filing of any dispositive motion in respect of Aligned Claims; (vi) the filing of any appeal in respect of Aligned Claims; (vii) the settlement or consensual resolution of any Aligned Claim; (viii) the abandonment of any Aligned

Claim; (ix) the distribution of Litigation Proceeds pursuant to section 4 of the Agreement, including, without limitation, on an interim basis, provided however that the Trustee retains full discretion and authority to make distributions of the Estate's portion of the Litigation Proceeds pursuant to section 4(iv)(y) of the Agreement in accordance with applicable law and rules; (x) matters relating to any waiver or impairment of joint litigation or attorney client privilege or the application of attorney work product doctrine; and (xi) the amendment of the Agreement to include additional Eligible Parties.  The Trustee shall convene the Parties by electronic mail or teleconference in advance of any Material Decision.  Any Material Decision requires the prior, written consent (written consent can be evidenced by electronic mail) of both Parties on notice to each other under the Agreement, which consent may not be unreasonably withheld.  In the event of a deadlock on any Material Decision or as may be required by the Trustee's fiduciary duty to the Estate, either the Trustee or Mirae may seek relief from the Court to authorize a Material Decision and to give direction to Special Litigation Counsel in connection therewith; provided, however, that if any Party determines that a deadlock has arisen regarding any Material Decision, such Party must provide the other Party 15 days' prior written notice before seeking relief from the Court as authorized in section 6 of the Agreement.

f.      Cooperation; Privilege:  The Parties agree to cooperate, in a commercially reasonable manner, in respect of the Aligned Claims, in each case including but not limited to by responding to discovery requests and making available pertinent witnesses to assist with fact investigation, depositions, and/or hearing testimony.  All communications of any sort between the Parties, the Special Litigation Counsel, and their employees, representatives and professionals, are subject to the joint litigation privilege established between the Parties under that certain Joint Privilege and Information Sharing Agreement, dated as of September 25, 2019 as well as attorney client privilege and attorney work product doctrine.

g.      Termination:  The Parties may terminate the Agreement solely under the following circumstances:  (a) Mirae, in its reasonable discretion, may terminate the Agreement upon 30 days prior written notice to the Trustee, upon the occurrence of any of the following:  (i) the engagement of Reid Collins & Tsai, LLP as Special Litigation Counsel is terminated and the Parties have not been able to agree upon the selection of substitute counsel within 30 days thereafter following good faith negotiations, (ii) Mirae has incurred funded costs and expenses to Special Litigation Counsel authorized pursuant to the budget governed by and under sub-sections 6(iii)–(iv) of the Agreement in connection with the prosecution of the Aligned Claims in excess of $100,000, or (iii) each of the Mirae Aligned Claims are settled in accordance with section 6(vii) of the Agreement and any distributions under section 4 of the Litigation Proceeds of the settlement of such claims are completed in accordance with the terms of the

Agreement; and (b) the Trustee, in the Trustee's sole discretion, may terminate the Agreement within 30 days following the closing of any transfer, assignment, or sale of the Mirae Aligned Claims in accordance with section 2(ii) of the Agreement, without any further notice by the Trustee to Mirae, its successor(s), transferee(s), or assign(s).  Upon either Party's exercise of its rights under section 9 of the Agreement, the Parties shall consult in good faith to allocate among the Parties any costs and expenses incurred as of the date of termination, and with respect to termination under subsections 9(a)(i) and (ii), to re-assess any Litigation Proceeds paid to Mirae pursuant to section 4(iv) of the Agreement prior to termination.  If the Parties are not able to agree on an allocation or a reassessment of Litigation Proceeds as provided for in section 9 of the Agreement, the Trustee or Mirae, upon notice to the other party, shall be entitled to seek relief from the Court to approve cost and expense allocation as well as matters relating to distribution of Litigation Proceeds consistent with the Agreement and applicable law and rules or as may be required by equity.

### RELIEF REQUESTED AND
### BASIS FOR RELIEF REQUESTED

24.    By this Motion, the Trustee seeks entry of an order substantially in the form attached to the Motion as Exhibit A, authorizing and approving the Trustee to enter into the Agreement with Mirae to coordinate their litigation efforts against ICE, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

**A.    The Agreement Must Be Fair and Equitable Under Bankruptcy Rule 9019(a) and Supported by a Sound Business Purpose Under Section 363(b) of the Bankruptcy Code to Be Approved.**

25.    As explained below, while the standards for approval "arguably overlap," for practical purposes the Court should both "evaluate the [Agreement] for a sound business purpose under [section] 363 and also determine whether [it] meets the fair-and-equitable standard used to analyze compromises under [Bankruptcy Rule] 9019."  *Cf. In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 228–29 (Bankr. S.D. Ohio 2008).

11

*The Bankruptcy Rule 9019 Standard.*

26.     Compromises[5] and settlements in bankruptcy are favored as a means of expediting the administration of the bankruptcy estates and providing for the efficient resolution of bankruptcy cases.  *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3rd Cir. 1996); *accord Will v. Next Proteins, Inc. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).  Such agreements are a normal part of the bankruptcy process.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  To achieve these results, Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve a compromise or settlement by the trustee after notice and a hearing.  Fed. R. Bankr. P. 9019(a).

27.     A bankruptcy court should approve a compromise under Bankruptcy Rule 9019(a) on "an informed, independent judgment that the compromise is fair and equitable."  *Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 93 (Bankr. D. Del. 2005), *aff'd*, Civ. No. 05-828, 2006 WL 2842462 (D. Del. Oct. 2, 2006); *accord In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010).  To make an informed judgment regarding the approval of a compromise, the bankruptcy court "must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate."  *Key3Media*, 336 B.R. at 92 (quoting *Martin*, 91 F.3d at 393).

---

[5] A compromise is defined as "[a]n agreement for the settlement of a . . . claim in which each party surrenders something in concession to the other."  *Compromise*, Black's Law Dictionary (11th ed. 2019); *see also, e.g.*, *Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.)*, Ch. 7 Case No. 03-82408, Adv. No. 04-8166, 2008 WL 682428, at *2 (Bankr. C.D. Ill. Mar. 7, 2008) (citing *Black's Law Dictionary*, *supra* (8th Ed. 2004); *In re Dow Corning Corp.*, 198 B.R. 214 (Bankr. E.D. Mich. 1996)) (same).  Thus, an agreement is "within the purview of [Bankruptcy] Rule 9019 as a compromise," even if it "is not a classic settlement," such as where the agreement "compromise[s] several issues that would require protracted litigation."  *In re Eurogas, Inc.*, 560 B.R. 574, 582 (Bankr. D. Utah 2016), *appeal dismissed*, 576 B.R. 648 (B.A.P. 10th Cir. 2017), *vacated and remanded on other grounds*, 755 F. App'x 825 (10th Cir. 2019).

28.     The decision to approve a compromise "is within the discretion of the bankruptcy court." *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).  When exercising this discretion, the bankruptcy court must "assess and balance" the value of the assets that are being compromised against the value to the estate of "the acceptance of the compromise proposal." *Id.* (quoting *Martin*, 91 F.3d at 393).  The Third Circuit has provided four criteria a bankruptcy court should consider in striking such a balance:

a.      the probability of favorably resolving the claims or rights in question;

b.      the likely difficulties in realizing the value of the assets being compromised;

c.      the complexity of the dispute involved, and the expense, inconvenience, and delay necessarily attending it; and/or

d.      the paramount interest of the creditors.

*Martin*, 91 F.3d at 393; *World Health Alts.*, 344 B.R. at 296; *see also, e.g.*, *In re Nortel Networks, Inc.*, 522 B.R. 491, 509 (Bankr. D. Del. 2014) (approving a compromise under the *Martin* factors). The bankruptcy court need not weight each factor equally in reaching its decision and in exercising its discretion.  *See In re Motors Liquidation Co.*, 555 B.R. 355, 367 (Bankr. S.D.N.Y. 2016) ("Not all factors must point in the same direction, and not all factors must be given the same weight."), *aff'd*, Civ. No. 09-50026, 2017 WL 3491970 (S.D.N.Y. Aug. 14, 2017); *In re RNI Wind Down Corp.*, Ch. 11 Case No. 06-10110, 2007 WL 949647, at *6 (Bankr. D. Del. Mar. 29, 2007) ("[F]ailure to satisfy one or more of the factors does not, *per se,* lead to a conclusion that a settlement should not be approved.").

29.     When applying these four criteria to the facts of a particular dispute, the bankruptcy court should only "canvass the issues" to ensure the compromise does not "fall[] below the lowest point in the range of reasonableness" since "an exact judicial determination . . . would defeat the purpose of compromising."  *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012); *In re Penn*

13

*Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979); *accord Nicole Energy Servs.*, 385 B.R. at

239.  Thus, the Agreement need not be the "best possible compromise" as long as it is within the

"reasonable range" of possibilities if the compromise were not approved.  *See, e.g., Stanziale v.*

*U.S. Risk Ins. Grp., Inc. (In re NovaPro Holdings, LLC)*, Ch. 7 Case No. 14-10895, 2018 WL

2102323, at *4 (Bankr. D. Del. May 4, 2018) (Silverstein, J.), *aff'd*, Civ. No. 18-766, 2019 WL

1324950 (D. Del. Mar. 25, 2019).

30.    "[C]ourts generally defer to a trustee's business judgment when there is a legitimate

business justification for the trustee's decision" to enter into the compromise.  *Goodwin v.*

*Carickhoff (In re Decade, S.A.C., LLC)*, Civ. No. 18-1880, 2020 WL 564903 (D. Del. Feb. 5,

2020).  Indeed, bankruptcy courts are "reluctant to disregard the business judgment of the Trustee"

to enter into a compromise of the estate's claims because "it is that Trustee who is more

knowledgeable of the strengths and weaknesses of their cases." *See, e.g., In re Batt*, 488 B.R. 341,

353 (Bankr. W.D. Ky. 2013).

*The Section 363(b) Standard.*

31.    "[A]s a matter of law, Bankruptcy Rule 9019(a), a rule of procedure, cannot, by

itself, create a substantive requirement of judicial approval" of compromises and settlements.

*Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 351 (3d Cir. 1999).  However,

compromises and settlements under Bankruptcy Rule 9019(a) "often involve the disposition of

assets of the estate, which may be subject to provisions of the Bankruptcy Code," such as section

363(b).  *In re Filene's Basement, LLC*, Ch. 11 Case No. 11-13511, 2014 WL 1713416, at *5 &

n. 7 (Bankr. D. Del. Apr. 29, 2014); *see also Del. Tr. Co. v Energy Future Intermediate Holdings,*

*LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 162–63 (D. Del. 2015) (stating

"compromises are favored" under section 363(b) and Rule 9019 "in order to minimize litigation

and expedite the administration of the bankruptcy estate"), *aff'd*, 648 F. App'x 277 (3d Cir. 2016).

14

32.     Where a compromise involves an asset of the estate, "[s]ection 363 of the Code is the substantive provision requiring a hearing and court approval," whereas "Bankruptcy Rule 9019 sets forth the procedure for approving [the] agreement to settle or compromise a controversy." *Martin*, 91 F.3d at 394–95 & n.2.  Thus, bankruptcy courts review such compromises in accordance with the use/sale-related provisions of section 363.  *See, e.g.*, *Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.)*, 292 B.R. 415, 421 (B.A.P. 9th Cir. 2003) (citing *Martin*, 91 F.3d at 394–95) ("We agree with the Third Circuit that the disposition by way of 'compromise' of a claim that is an asset of the estate . . . simultaneously implicates the 'sale' provisions under section 363 . . . and the 'compromise' procedure of Rule 9019(a)."); *In re Princeton Alternative Income Fund, LP*, Ch. 11 Case No. 18-14603, 2019 WL 4127148, at *2 (Bankr. D.N.J. Aug. 29, 2019) ("Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a) empower a bankruptcy court to approve a proposed compromise . . . .").

33.     Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "[T]he express power to enter [into] settlements and compromises is now simply part of the trustee's statutory power of sale of assets."  *In re Dow Corning Corp.*, 198 B.R. 214, 246 (Bankr. E.D. Mich. 1996); 3 *Collier on Bankruptcy* ¶ 363.02 (Richard Levin & Henry J. Sommer eds., 16th ed. 2020) ("Section 363(b) has been applied to . . . uses that one might not ordinarily posit as a question of use of property, but rather as entering into transactions out of the ordinary course of business.  This seems appropriate, because nearly any kind of transaction will involve use, sale or lease of property of the estate . . . .").  Thus, bankruptcy courts are empowered by section 105(a) of the Bankruptcy Code to implement section 363(b) through orders approving compromises of estate property under Bankruptcy Rule 9019(a).  *See*

11 U.S.C. § 105(a) ("The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

34.    "As applied in the Third Circuit, a court should approve a [trustee's] use of assets outside the ordinary course of business if the [trustee] can demonstrate a sound business justification for the proposed transaction."  *Comput. Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul Glob., Inc.)*, 293 B.R. 124, 126 (D. Del. 2003) (citing *Martin*, 91 F.3d at 396); *see also, e.g.*, *First Union Baptist Church of the Bronx v. TD Capital Group LLC (In re First Union Baptist Church of Bronx)*, 572 B.R. 79, 100 (Bankr. S.D.N.Y. 2017) ("[I]n determining whether to grant a debtor authority to enter into an agreement to use assets out of the ordinary course of business, the ordinary standard is whether the debtor has exercised reasonable business judgment."), *rev'd in part on other grounds*, Civ. No. 17-7184, 2018 WL 770401 (S.D.N.Y. Feb. 7, 2018); *In re Tubular Techs., LLC*, 372 B.R. 820, 822 (Bankr. D.S.C. 2007) (stating that "[b]ecause the Trustee is requesting permission to use funds from the estate to pay its Special Counsel's expenses, the Court believes the request is more appropriately analyzed under 11 U.S.C. § 363" and that "[f]or the Court to approve the Motion, it must determine that a good business reason exists" for such use); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153–55 (D. Del. 1999) (affirming the bankruptcy court's order authorizing the debtor to use property of the estate under section 363(b) to fund its employee incentive programs because "a sound business purpose justified" such use).

35.    As is the case under Bankruptcy Rule 9019, when determining whether to approve the use of property of the estate under section 363(b) of the Bankruptcy Code in connection with

a compromise, "under normal circumstances the court [should] defer to the trustee's judgment so long as there is a legitimate business justification." *Martin*, 91 F.3d at 395.

> **B.** **The Agreement Should Be Approved Because It Minimizes the Complexity and Expense of Litigating the Parties' Claims Against ICE and Maximizes the Value of the Estate Aligned Claims.**

36.    The Trustee submits that the Agreement should be approved because it is both (a) fair, equitable, and in the best interests of the Estate as it satisfies the Third Circuit's *Martin* factors and falls well within the range of reasonableness under Bankruptcy Rule 9019(a); and (b) supported by a sound business purpose and otherwise satisfies the standard for approval under section 363(b) of the Bankruptcy Code.

*The Agreement Is Fair, Equitable,*
*and in the Best Interests of the Estate.*

37.    The Parties' claims against ICE relating to the Bond Mismarking are separate and distinct. Thus, failure to coordinate their litigation efforts would subject both the Estate and Mirae to the substantial risk that they would (i) employ conflicting or even adverse litigation strategies; (ii) become entangled in a dispute regarding the appropriate amount of ICE's liability to each of the Parties for its respective damages; and (iii) wind up in a fight over the proper allocation and distribution of the proceeds of any judgments resulting from the litigation.

38.    Separately pursuing their respective claims would also cause each of the Parties to incur unnecessary, significant, and redundant costs and expenses in investigating the facts and circumstances surrounding the Bond Mismarking and funding the litigation.

39.    In the Agreement, the Parties have resolved these issues by agreeing to (i) coordinate their investigation and litigation efforts, (ii) employ Special Litigation Counsel to jointly represent them for such purposes, (iii) designate the Trustee as the Distribution Agent in respect of the Litigation Proceeds, (iv) provide for payment from the Litigation Proceeds of the

fees, costs, and expenses of the Special Litigation Counsel and related Estate professionals, and (v) allocate the net Litigation Proceeds between the Parties.  Thus, even prior to the filing of any potential litigation, the Agreement resolves complicated issues between the Trustee and Mirae, and greatly minimizes the complexity involved in separately litigating their claims against ICE and the expense, inconvenience, and delay necessarily attending such claims, as well as the overall volume of the litigation.

40.    The Agreement also minimizes the risk to the Estate of litigating its claims (and of funding such litigation) against ICE by acquiring the right to recover from the proceeds of Mirae's claims in addition to its own, which meaningfully improves both the likelihood of the Estate achieving a recovery from ICE and the amount of that recovery.  Indeed, based on the investigation already conducted by the Trustee into the Bond Mismarking and legal analysis of the strengths and weaknesses of the Estate's and Mirae's claims, the Trustee submits that the Estate is obtaining fair and reasonable consideration under the Agreement.

41.    This Court has approved a similar compromise of claims, and was affirmed by the district court, in a prior case involving the Trustee.  In *Goodwin v. Carickhoff (In re Decade, S.A.C., LLC)*, Civ. No. 18-1880, 2020 WL 564903 (D. Del. Feb. 5, 2020), this Court had approved a compromise whereby (a) the estate waived certain claims against 23 Capital Limited ("23 Capital"), a creditor of the estate; and (b) 23 Capital agreed in exchange to (i) partially waive its lien on certain of the estate's commercial tort claims and proceeds, (ii) the appointment of its attorneys as special counsel to the Trustee to prosecute those claims, (iii) fund the Trustee's investigation and prosecution of those claims, and (iv) share in any recovery on those claims with the estate.  *Goodwin*, 2020 WL 564903, at *1–2.

156698.01600/123701944v.1

42.     In *Goodwin*, the district court agreed that the compromise "represented the only chance . . . to try and realize any value flowing from the Debtors' commercial tort claims and was a good outcome in an uncertain litigation scenario, where it was unlikely any other party would agree to fund the pursuit of those claims knowing the recovery was going to someone else." *Id.* at *5.  The Court "assessed and balanced" the benefits of those claims "with the possible, limited value of [the] alleged claims held by the Debtors' estates against 23 Capital and compromised in the settlement . . . . and determined that the Trustee's business judgment in determining that the benefits outweighed the risks was sound." *Id.*

43.     The same considerations supporting approval of the compromise in *Goodwin* supports the approval of the Agreement in this case.   The Agreement represents the best opportunity for the Estate to achieve any meaningful recovery from ICE and therefore is "a good outcome in an uncertain litigation scenario," as was the compromise of the estate's commercial tort claims in *Goodwin*.  In the Trustee's estimation, the value that this opportunity is likely to provide to the Estate, particularly when combined with the efficiencies resulting from coordinating investigation and litigation efforts with Mirae, supports compromising the value of the share of proceeds of any Estate Aligned Claims that will flow to Mirae under the Parties' distributional waterfall.  Thus, the Trustee's business judgment in entering into the Agreement is sound.

44.     Finally, there is precedent for approving litigation support agreements containing this type of distributional waterfall for proceeds of claims belonging to the estate with the proceeds of claims belonging to third parties.  *See, e.g.*, *Order Approving Motion for Approval, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, of Settlement Regarding Deloitte Claim Funding and Allocation*, *In re*

*Taylor, Bean & Whitaker Mortg. Corp.*, Ch. 11 Case No. 09-07047 (Bankr. M.D. Fla. Aug. 27, 2012), ECF No. 6039 (the "Taylor Bean Order").[6]

45.    Accordingly, based on the circumstances of this case, the Trustee has determined that the Agreement is fair, equitable, in the best interests of the Estate, and well within the range of reasonableness for approval under Federal Rule of Bankruptcy Procedure 9019(a).

*There Is a Sound Business Purpose*
*to Enter Into the Agreement.*

46.    This Motion is further supported by an extensive evaluation by the Trustee of the potential costs and benefits of the Agreement to the Estate.  It was only after the Trustee, in conjunction with advice from experienced professionals, (a) completed his initial investigation and legal analysis of the Estate's claims, (b) evaluated potential alternatives, (c) thoroughly prepared and pitched the proposal to coordinate investigation and litigation efforts to each of the Petitioning Creditors, and (d) heavily negotiated the terms of the Agreement with Mirae over the course of several months, that he finally determined to enter into the Agreement.

47.    Based on that evaluation, and taking into account the strengths, weaknesses, and costs of independently investigating and litigating the Estate's claims, the compromise represented by the Agreement is the best opportunity for the Estate to maximize the value of its assets.  Thus, for the same reasons that the Agreement is fair, equitable, and in the best interests of the Estate under Bankruptcy Rule 9019(a), there is a sound business purpose to enter into the Agreement. Likewise, the allocation of the proceeds of the Parties' Aligned Claims pursuant to the waterfall created by the Agreement will provide the Estate with fair and reasonable consideration.

---

[6] The *Plan Trustee's Motion for Approval of Settlement Regarding Deloitte Claim Funding and Allocation*, *In re Taylor, Bean & Whitaker Mortg. Corp.*, Ch. 11 Case No. 09-07047 (Bankr. M.D. Fla. July 12, 2012), ECF No. 5659 (the "Taylor Bean Motion"), together with the Taylor Bean Order, are attached hereto as Exhibit B and Exhibit C, respectively.

156698.01600/123701944v.1

48.    The Agreement is the product of good faith negotiations with Mirae, which, along with the Debtor and the other Petitioning Creditors, is one of the primary stakeholders possessing claims against ICE relating to the Bond Mismarking, and therefore is uniquely positioned to enter into the Agreement with the Trustee.  As a result, the Trustee has determined that the disposition of the proceeds of the Estate Aligned Claims through the Agreement is a good use of those assets based upon the consideration to be received under the Agreement and is supported by his sound business judgment.  *Cf. In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 524–28 (Bankr. S.D.N.Y. 2007) (approving, pursuant to section 363 and Bankruptcy Rule 9019,  the sale of the estate's interests in certain insurance policies and proceeds to the insurers under those policies even though the insurers were "in a unique position to make the purchase" and there were no other parties "with the ability or motivation to do so").

49.    Accordingly, the standard for approval under section 363(b) of the Bankruptcy Code with respect to the use of property of the estate is satisfied.  There is a sound business purpose for making the compromises contained in the Agreement and it is the Trustee's business judgment that entering into the Agreement is in the best interests of the Estate.  The Trustee submits that an order granting the relief requested herein is a matter within the discretion of this Court and would be consistent with the provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 105(a).

## NOTICE

50.    Notice of this Motion has been provided, in accordance with the Court's *Order Granting Motion of Chapter 7 Trustee to Limit Notice and Establish Noticing Procedures Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002, 6004, 6007 and 9007 of the Federal Rules of Bankruptcy Procedure* [Docket No. 106], to the following parties or their counsel of record:  (i) the Debtor, (ii) the Office of the United States Trustee, (iii) each of the Petitioning Creditors, and (iv) all parties that have requested pursuant to Bankruptcy Rule 2002 to receive

notice in this case.  The Trustee submits, in light of the nature of the relief requested, no further notice is necessary or required.

## NO PRIOR REQUEST

51.    No prior request for the relief requested in this Motion has been made to this Court or to any other court.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that the Court enter an order (i) approving the Agreement substantially in the form attached hereto as Exhibit A; (ii) authorizing the Trustee to enter into the Agreement; and (iii) granting such other and further relief as the Court deems just and equitable.

Dated:  August 11, 2020  
      Wilmington, Delaware

**BLANK ROME LLP**  
*/s/ Stanley B. Tarr*  
Regina Stango Kelbon (DE No. 5444)  
Stanley B. Tarr (DE No. 5535)  
1201 N. Market Street, Suite 800  
Wilmington, Delaware 19801  
Telephone:  (302) 425-6400  
Facsimile:  (302) 425-6464  
Email:  Kelbon@BlankRome.com  
Tarr@BlankRome.com  

Michael B. Schaedle (admitted *pro hac vice*)  
Michael D. Silberfarb (admitted *pro hac vice*)  
One Logan Square  
130 North 18th Street  
Philadelphia, Pennsylvania 19103  
Telephone:  (215) 569-5500  
Facsimile:  (215) 569-5555  
Email:  Schaedle@BlankRome.com  
MSilberfarb@BlankRome.com  

*Co-Counsel to Chapter 7 Trustee*

156698.01600/123701944v.1