**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------------------x

In re

LIVE WELL FINANCIAL, INC.

Debtor.

Chapter 7

Case No. 19-11317 (LSS)

---------------------------------------------------------------------------x

DAVID W. CARICKHOFF, solely in his capacity as chapter
7 trustee of Live Well Financial, Inc.,

Plaintiff,

- against -

WHITEFORD TAYLOR & PRESTON LLP,

Defendant.

Adv. Proc. No. _____

---------------------------------------------------------------------------x

## COMPLAINT

Plaintiff, David W. Carickhoff, the Chapter 7 Trustee ("Plaintiff" or the "Trustee") of the estate of Live Well Financial, Inc. ("Live Well" or "Debtor"), by and through his undersigned counsel, files this Complaint against Defendant Whiteford Taylor & Preston LLP ("Defendant" or "Whiteford") to avoid and recover certain fraudulent transfers to the Defendant, and, in support thereof, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff seeks to avoid and recover from Defendant, or from any other person or entity for whose benefit the transfers were made, certain fraudulent transfers of property of the Debtor made to or for the benefit of Defendant pursuant to sections 544, 548, and 550 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and applicable state law.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated February 29, 2012.

3.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a). This adversary proceeding is related to a bankruptcy case under chapter 7 of the Bankruptcy Code that is pending in this district with docket number 19-11317 (LSS) (the "Bankruptcy Case").

5.      The predicates for the relief sought herein are sections 544, 548, and 550 of the Bankruptcy Code, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable state law.

6.      Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry of final orders and judgment by the Court in this adversary proceeding.

## PARTIES

7.      Plaintiff is the Trustee of Live Well in the Bankruptcy Case. Plaintiff is authorized to bring this action pursuant to section 704 of the Bankruptcy Code.

8.      Live Well is a corporation incorporated under the laws of the State of Delaware and which, prior to the Bankruptcy Case, had its principal place of business in Richmond, Virginia. Prior to ceasing operations, Live Well was a financial services company that provided reverse mortgages and forward mortgages to customers, serviced mortgages, and traded in mortgage-

backed securities. Live Well was founded by Michael C. Hild ("Hild") in 2005, and at all relevant times, Hild served as Live Well's Chief Executive Officer and a director on its board of directors.

9. Defendant Whiteford Taylor & Preston LLP is a limited liability partnership formed under the laws of the State of Maryland to practice law. Upon information and belief, Whiteford has law offices in Baltimore, Columbia, Ocean City, Rockville, and Towson, Maryland; Falls Church, Richmond, Roanoke, and Virginia Beach, Virginia; Lexington, Kentucky; New York City and Tarrytown, New York; Pittsburgh, Pennsylvania; and Washington, District of Columbia.

## FACTUAL BACKGROUND

### A. Live Well's Bond Portfolio.

10. Live Well was founded by Hild in 2005 as a private financial services company. For the first nine years of its operations, Live Well primarily originated and serviced home equity conversion mortgages ("HECMs"), more commonly known as "reverse mortgages."

11. An HECM or "reverse mortgage" is a loan to a borrower aged 62+ that is secured by a mortgage lien on the borrower's primary residence. Unlike a traditional home mortgage, an HECM generally has no repayment obligation during the life of the borrower so long as the borrower continues to reside in the primary residence and the loan otherwise is not in default.

12. But in or around August 2014, Live Well expanded its business by acquiring a portfolio of approximately 18 HECM IO (home equity conversion mortgage, interest only) bond strips from Stifel Nicolaus & Company ("Stifel"), a New York-based investment bank and broker-dealer. Live Well paid Stifel approximately $46 million in connection with the transaction.

13. HECM IO bonds are reverse mortgage-backed securities that entitle the holder to receive a portion of the interest payments, but not principal payments, from a particular pool of

reverse mortgage loans as well as a monthly "coupon" (effectively, an interest rate) based upon the performance of the underlying reverse mortgage loans.

14.     Live Well financed the acquisition of both its initial HECM IO bond portfolio and its subsequent acquisitions of HECM IO bonds by entering into a series of bond repurchase ("repo") agreements with various third party counter-parties or lenders ("bond lenders" or "repo lenders").

15.     A repo agreement is essentially a type of short-term borrowing that is structured as a sale and repurchase of the security. In a repo, the seller of a security (the borrower) sells the collateral to the purchaser (the lender or repo counterparty) and promises to buy the collateral back from the purchaser at a later date and at a specified price (which is generally higher than the initial sale price to incorporate an "interest" payment).

16.     The amount of money that a repo seller such as Live Well can borrow from a repo lender is determined by two things: (i) the fair market value of the securities that served as collateral and (ii) the discount or "haircut" applied by the lender. By way of example, if the fair market value of the pledged bonds was $10 million, and the "haircut" was 10%, the repo lender would "lend" $9 million.[1]

17.     Because the value of the HECM IO bonds that served as collateral could fluctuate up or down during the term of a repo agreement, the repo agreements included two-way "margin" agreements to maintain the "haircut" that would effectively increase or decrease the amount of the "loan" in proportion to the increase or decrease in the value of the bonds. In the same example as above, if the value of the pledged bonds decreased to $5 million (the "haircut" would remain the

---

[1] Typically, the repo lenders that loaned to Live Well applied a haircut of between 10% and 20% of the value of the pledged bonds. This "haircut" was important to protect the repo lenders because, if Live Well defaulted on its obligations, the lenders could seize the bonds and liquidate them to satisfy the debt. Thus, the haircut was intended to ensure that the proceeds of a sale of the bonds would be sufficient to satisfy the debt.

same), the loan could only be $4.5 million (90% of $5 million), and Live Well would have to "post margin" of—in other words, pay back—$4.5 million. Conversely, if the value of the pledged bonds increased to $20 million, the loan would increase proportionally to $18 million, and the lender would have to post margin of $9 million.

18.    Bottom line, the greater the fair market value of the securities, the more money that the repo lenders would agree (and, in many cases, be required) to lend to Live Well. The less the fair market value of the securities, the less money that the repo lenders would agree to lend (often triggering an obligation for Live Well to repay its loans).

19.    Needless to say, at all stages of these financing transactions, determining an independent valuation of the HECM IO bonds serving as collateral for the repo lenders was the critical issue. The repo agreements between Live Well and its repo lenders required Live Well to obtain third party pricing for the HECM IO bonds from an ***independent*** source. Without independent bond valuations, repo lenders would never have agreed to extend financing for the purchase of the bonds.

**B.    Michael Hild's Fraudulent Bond Pricing Scheme.**

20.    The HECM IO bonds Live Well acquired were relatively thinly traded and not often found in pricing service databases. One of the few pricing services that did publish prices for these HECM IO bonds was called Interactive Data Pricing and Reference Data LLC ("IDC").

21.    Initially, IDC was publishing daily price quotes for Live Well's HECM IO bonds using IDC's own independent methodology.

22.    However, at Hild's direction, Darren Stumberger ("Stumberger"), Executive Vice President in charge of overseeing Live Well's bond trading desk, and other members of Live

Well's bond trading desk launched a pressure campaign to convince IDC to stop publishing its own price quotes and to rely exclusively on bond price quotes submitted by Live Well.

23.     In February 2015, after numerous emails, calls, and meetings, Live Well's pressure campaign proved successful. As Stumberger reported to Hild in a February 12, 2015 email, "This issue is solved…. We will be supplying prices daily to IDC, and IDC will use these." Stumberger further assured Hild that IDC "*will use the prices verbatim and not model these bonds until we are interested in them doing so*." (emphasis added).

24.     Thus—unbeknownst to Live Well's lenders—IDC ceased using its own pricing model from that point forward and instead simply published the prices provided to IDC by Hild, Stumberger, and other Live Well employees without question.

25.     Immediately and over the next several months, Hild pushed Stumberger and Live Well's bond trading desk employees to submit bond price quotes that increased the apparent value of Live Well's bond portfolio. These inflated price quotes were *not* based on fair market value. Indeed, by as early as April 2015—just two months into the scheme—Live Well's bond-related debt already exceeded the fair market value of the bonds. This was plainly inconsistent with the terms of the repo lending arrangements, which required the debt to be substantially less than the fair market value of the collateral.

26.     As already explained, because the fair market value of the bonds was one of two things that dictated how much money Live Well could borrow from its repo lenders, the inflated prices that Live Well was reporting to IDC—and that IDC was then publishing—allowed Live Well to borrow substantially more money that it otherwise could.

27.     In or about September 2015, the Hild and his coconspirators ramped up the fraudulent bond pricing scheme and began reporting bond prices that bore little relation to market

conditions or market values. Indeed, beginning in September 2015, Hild and his coconspirators consistently submitted prices to IDC that were on average *29% higher* than the purchase price Live Well had just paid for the bonds in arm's-length market transactions, often on the *same day*.

28.     But IDC continued to publish the prices Hild and his coconspirators reported without question.

29.     The inflated bond prices that Hild and his coconspirators reported allowed Live Well to borrow more money from its lenders. Hild and his coconspirators then used that money to purchase more HECM IO bonds, which they then immediately marked up, which allowed them to borrow even more money from its lenders, which allowed them to purchase more bonds, *etc.* Hild and his coconspirators would repeat this play again and again over the next year and half.

30.     As Hild described this scheme on a phone call with employees on Live Well's bond trading desk: "it is a little bit of a *self-generating money machine*, right? In that if you buy [HECM IO bonds] in the marketplace and then apply this methodology, every single time you do that, you're gonna free up additional borrowing capacity, right?" (emphasis added).

31.     Hild and his coconspirators used the new money "generated" from this scheme to pay off Live Well's repo lenders, purchase additional bonds to perpetuate the scheme, and satisfy Live Well's other obligations.

32.     Unsurprisingly, Hild and his coconspirators also used a substantial portion of the money "generated" by the scheme to enrich themselves.

33.     For example, between January 2016 through June 2019, Hild caused Live Well to pay himself more than *$25 million*—an average of more than *$7.25 million per year* and more than *seven times* his prior salary before the fraud.

34.     Hild similarly paid off his coconspirators. In exchange for their assistance in the bond mispricing scheme, Hild caused Live Well to pay to Eric G. Rohr ("Rohr"), Live Well's CFO, and Stumberger over $7.5 million in unjustified and excess compensation between 2015 and 2019.

**C.    The Scheme Unravels.**

35.     But, of course, it was not actually a "self-generating money machine." The money was borrowed from repo lenders, and Live Well was borrowing more money than it could ever legitimately repay.

36.     Indeed, between early 2015 and March 2017, Live Well's bond portfolio had grown from approximately 18 bonds to approximately 50 bonds—financed by debt that, over the same time period, had ballooned from $46 million to ***more than $414 million***.

37.     Although Live Well's financial statements based on its fraudulently-inflated prices made it appear as if it was still solvent this whole time, that was false. As already noted, by as early as April 2015, the total amount of bond-secured debt consistently exceeded the fair market value of the bonds.

38.     And by no later than May or June 2016, Live Well already was balance sheet insolvent as a result of the scheme. Specifically, by June 2016, the actual value of the bond portfolio was at least $200 million less than Live Well's inflated valuations, and Live Well was holding debt that was at least $100 million greater than the actual value of its bond portfolio.

39.     That amount of debt far exceeded the unencumbered value of Live Well's legitimate business activities and assets and rendered Live Well consistently insolvent, undercapitalized, and unable to pay its debts in full as they became due.

40.    Hild and his coconspirators knew that this scheme was not sustainable in the long term. There was no possible way that Live Well could legitimately repay its loans, and it was only a matter of time before Live Well's creditors caught on.

41.    Thus, throughout the lifespan of the fraud, Hild had been hiding the proceeds of the fraud in and with a network of limited liability companies wholly owned and operated by himself and/or his wife Laura D. Hild (the "Hild entities"). In total, Hild extracted more than $26 million from Live Well and its creditor during the course of the fraud. Virtually all of those funds were funneled into the Hild entities, where the money then circulated under the guise of "rent payments" or "capital contributions." Ultimately, the majority of the funds either ended up being invested in real properties located in Richmond, Virginia—titled in the name of Hild entities that were nominally wholly owned and operated by Laura Hild—or in Laura's personal bank account.

42.    The music began to falter in early 2017, when two of Live Well's biggest creditors sought to reduce or eliminate their respective relationships with Live Well, which precipitated a crisis. Live Well could not possibly pay these creditors back because, even if it sold the bonds collateralizing the debt, the bonds were not worth anywhere near the amount of the corresponding debt.

43.    Thus, Live Well hiked the prices it submitted to IDC even further. Although this solved Live Well's short-term liquidity problems, the bond prices were increasingly unrealistic. Indeed, by March 24, 2017, the bond prices Live Well was reporting were ***45.7% higher*** than the bond prices that were used by another bond repo lender that did not rely on IDC pricing.

44.    At around the same time, the SEC began investigating Live Well's bond trading activities. In or around July 2017, the SEC issued subpoenas to Live Well, Stumberger, and other individuals working in Live Well's bond trading desk.

45.    In late 2018, Live Well's repo lenders also became suspicious. Eventually, one of them demanded that Live Well repay the loan principal of over $100 million. With the SEC watching, Hild was unable to use the scheme to generate more money. Hild could only respond that Live Well lacked the cash to pay the lender back. When the lender demanded that Live Well sell their collateral to generate the necessary cash, Hild falsely claimed he could not do so because the bonds were illiquid and did not regularly trade in the market.

46.    Live Well's collapse rapidly followed.

47.    In or about December 2018, Rohr, Live Well's CFO, resigned from Live Well.

48.    In or about March 2019, Stumberger resigned from Live Well.

49.    In or about late April 2019, Live Well's newly appointed interim CFO observed that the bond portfolio was not being priced, or "marked," to market. The interim CFO informed Michael Hild that he would not sign off on Live Well's financial statements for the first quarter of 2019 because the interim CFO believed, correctly, that the reported value of the bond portfolio was significantly overstated.

50.    As a result, on or about May 3, 2019, Hild caused Live Well to cease business operations and to terminate substantially all its staff.

51.    In June 2019, the bond portfolio was revalued using independent pricing. This caused the aggregate value of the bond portfolio to drop from more than $446 million to less than $236.4 million, a staggering revaluation of ***nearly $210 million***.

52.    On June 10, 2019 (the "Filing Date"), three of Live Well's repo lenders filed an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code against Live Well in the United States Bankruptcy Court for the District of Delaware.

53.    On July 1, 2019, this Court entered the Order for Relief in Involuntary Case.

54.    On that same date, the Trustee was appointed pursuant to section 701 of the Bankruptcy Code.

55.    The Trustee is the duly qualified and appointed Chapter 7 Trustee of the Live Well bankruptcy estate.

56.    Live Well's creditors (excluding insiders) have asserted more than $110 million in claims against the bankruptcy estate.

57.    On August 29, 2019, the office of the United States Attorney for the Southern District of New York announced a five-count Indictment against Michael Hild relating to the bond pricing scheme, specifically: (i) conspiracy to commit securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud. Two of his confederates, Stumberger and Rohr, pleaded guilty to the same five counts, and each of Stumberger and Rohr would later testify against Hild, identifying him as the primary malefactor behind the bond mispricing scheme.

58.    On April 30, 2021, after a three-week trial and after less than four hours of deliberation, a jury unanimously found Michael Hild guilty on all counts charged.

**D.    The 2016 Guaranty and Indemnity Agreement and the Challenged Transfers.**

59.    Back in 2016, Hild had directed Live Well to enter into a Personal Guaranty Fee and Indemnity Agreement ("Guaranty and Indemnity Agreement") with him, pursuant to which agreement Live Well would pay Hild fees equal to a certain percentage of Live Well's debts guaranteed by Hild—including guarantees dating back to 2005, even though many of these debt facilities had been retired years before. The Guaranty and Indemnity Agreement also required Live Well to broadly indemnify Michael Hild for any and all costs—including attorneys' fees—that he might incur arising out of or relating to his guaranties.

60.    The Guaranty and Indemnity Agreement was the product of fraud and multiple breaches of fiduciary duty.

61.    The Guaranty and Indemnity Agreement was signed on behalf of Live Well by Rohr, one of Hild's closest criminal conspirators.

62.    The Guaranty and Indemnity Agreement was then "approved" by a hopelessly conflicted board of directors consisting of Hild and Stuart H. Cantor ("Cantor").

63.    Just days after the Guaranty and Indemnity Agreement was approved, Hild caused Live Well to pay Rohr a "bonus" of $1,600,000 and caused Live Well to pay Cantor more than $1,000,000 in "director fee" payments. In reality, Hild had bought Rohr's and Cantor's participation in a sham transaction that perpetuated the fraud and deepened Live Well's insolvency.

64.    The Guaranty and Indemnity Agreement, and the obligations Live Well purportedly incurred thereunder, exhibit numerous badges of fraud, including, among other things:

    a.    The obligations Live Well incurred were to an insider;

    b.    Live Well received less than reasonably equivalent value in exchange for the obligations incurred under the Guaranty Fee Agreement because, among other things, it required Live Well to pay to Hild an annual fee equal to 1.5% of the gross amount of all debts ever guaranteed by Hild, regardless of the amount actually borrowed by Live Well, regardless of the fact that most of those debts had already been fully satisfied, and regardless of the fact that (absent Hild's own fraud) these debts were structured to be fully secured and therefore virtually risk-free to Hild;

    c.    Live Well was insolvent at the time the obligations under the Guaranty Fee Agreement were incurred; and

    d.    The agreement was executed on behalf of Live Well by Rohr, one of Hild's criminal conspirators, and was blessed by Cantor, a faithless director.

65.    Moreover, the obligations under the Guaranty and Indemnity Agreement were purportedly incurred by Live Well in furtherance of the ongoing fraudulent scheme by Hild and

his coconspirators to loot the company through the perpetration of their Ponzi-like bond price-fixing scheme that dissipated all of Live Well's legitimate assets. As such, the obligations incurred under the Guaranty and Indemnity Agreement—including, without limitation, the obligations to pay Hild's personal legal fees—are presumed to have been incurred with the actual intent to hinder, delay, or defraud creditors.

66.     The majority of the money that Hild wrongfully extracted from Live Well during the lifespan of the bond mispricing fraud—over $15 million of a total of more than $26 million—came in the form of purported guaranty fee payments under the Guaranty and Indemnity Agreement.

67.     To be clear—not only was the Guaranty and Indemnity Agreement flagrantly self-interested—it made no rational business sense whatsoever, was not ordinary, had no precedent within Live Well, grossly overcompensated Hild, and was in all respects a clear breach of Hild's fiduciary duties to Live Well.

68.     Further, Live Well's legitimate business activities could not possibly have supported the exorbitant monthly guaranty fee payments of more than *$500,000 per month* and other obligations incurred under the Guaranty and Indemnity Agreement. The only source of liquidity sufficient to generate such massive overcompensation of Hild was his fraudulent bond mispricing scheme.

69.     For these reasons and others, Plaintiff is seeking in a separate adversary proceeding, *inter alia*, a declaration that the Guaranty and Indemnity Agreement is invalid and void, the incurrence of obligations thereunder being in and of themselves actual and constructive fraudulent transfers under applicable bankruptcy and non-bankruptcy law, and recovery of all the guaranty fees paid thereunder by way of a concurrently filed Complaint before this Court against Michael

Hild, Laura Hild, the Hild entities, and others. *See* Complaint (Adv. Pro. D.I. 1), No. 21-50966-LSS (Bankr. D. Del. Jun. 28, 2021).

70.    Upon information and belief, on December 4, 2018, Hild engaged Whiteford to represent him individually—not Live Well—with respect to his guaranties of Live Well's debts.

71.    Upon information and belief, Hild invoked Live Well's purported indemnification obligations pursuant to the Guaranty and Indemnity Agreement to cause Live Well to make several transfers to Whiteford both shortly before and after the Filing Date.

72.    Specifically, on or about May 11, 2019, a week after Hild abruptly shut down Live Well's business operations, Hild caused Live Well to transfer not less than $50,000 directly from Live Well's bank account to Whiteford.

73.    On or about June 11, 2019, one day after the involuntary petition was filed against Live Well, Hild caused Live Well to transfer an additional amount, not less than $150,000, directly from Live Well's bank account to Whiteford.

74.    The challenged transfers (collectively, the "Transfers") are set forth on **Exhibit A** to this Complaint.

75.    Based upon a review of the Debtor's books and records, there is no evidence Whiteford provided services to or represented Live Well before or after any of the challenged Transfers were made.

76.    Live Well's creditors (excluding insiders) have asserted more than $110 million in claims. For all purposes relevant to this Complaint, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged such transfers. Such creditors include, without limitation, Mirae Asset Securities (USA) Inc., Republic Bank & Trust Company, Reverse Lending Club LLC, and Credit Plus, Inc., among many others.

## FIRST CAUSE OF ACTION
### (Avoidance of Actual Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(A))

77.     The Trustee incorporates each and every allegation contained in paragraphs 1 through 76 as though they were fully set forth herein.

78.     As set forth above and in the attached Exhibit A, on May 10, 2019, Michael Hild caused Live Well to transfer $50,000 to Whiteford.

79.     This Transfer came directly from one of Live Well's bank accounts, and Live Well had an interest in the property transferred.

80.     As explained in detail above, the Transfer was made with the actual intent to hinder, delay, or defraud Live Well creditors. In particular, as described above, Hild had been actively engaged in a massive bond mispricing fraud from 2015 through the Filing Date. Because of the pervasive fraud, criminal conduct, and other misconduct set forth in this Complaint, including the inevitability that Live Well would and did become unable to repay its repo lenders, the Transfer is also presumed to have been made with the actual intent to hinder, delay, or defraud creditors.

81.     And the Transfer to Whiteford—purportedly pursuant to a self-interested, illegitimate, and void Guaranty and Indemnity Agreement—were part of Hild's effort to extract as much money and value as possible out of Live Well before he could be stopped.

82.     Indeed, Live Well received nothing of value in exchange for the Transfer.

83.     Whiteford did not take for value or in good faith.

84.     Based upon a review of the Debtor's books and records, there is no evidence Whiteford provided services to or represented Live Well before or after any of the challenged Transfers were made.

85.     Because the Guaranty and Indemnity Agreement was the product of fraud and multiple breaches of fiduciary duty, that agreement and any obligations of Live Well thereunder are void *ab initio*.

86.     The Transfer was also outside of the ordinary course of business for or in respect of Live Well.

87.     Additionally, at the time of the Transfer, Live Well was deeply insolvent. By the time of the Transfers, Live Well owed in excess of $110 million in non-insider debts, which far exceeded the total value of its assets. And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the ever-growing dependence of Hild and his coconspirators on new bond repo lenders to repay old lenders, Live Well is also presumed to have been insolvent from the very inception of the fraudulent scheme beginning in 2015. Further, the Transfer was made after Live Well's business had collapsed and substantially all of its employees had been terminated.

88.     By reason of the foregoing, the above Transfer (and any related obligation or undertaking under the Guaranty and Indemnity Agreement or similar agreement or document) constitutes an actual fraudulent transfer that should be avoided pursuant to Bankruptcy Code section 548.

### SECOND CAUSE OF ACTION
**(Avoidance of Actual Fraudulent Transfers Pursuant to 11 U.S.C. § 544 and Applicable State Law, including without limitation 6 Del. Code § 1301, *et seq*., and Va. Code Ann. §§ 55-80, *et seq.*; 55.1-400, *et seq.*)**

89.     The Trustee incorporates each and every allegation contained in paragraphs 1 through 88 as though they were fully set forth herein.

90.     As set forth above and in the attached Exhibit A, on May 10, 2019, Michael Hild caused Live Well to transfer $50,000 to Whiteford, and on June 11, 2019, Michael Hild caused Live Well to make two additional transfers, for $50,000 and $100,000, to Whiteford.

91.     Each of the Transfers came directly from one of Live Well's bank accounts, and Live Well had an interest in the property transferred.

92.     As explained in detail above, each of the Transfers was made with the actual intent to hinder, delay, or defraud Live Well and its creditors. In particular, as described above, Hild had been actively engaged in a massive bond mispricing fraud from 2015 through the Filing Date. Because of the pervasive fraud, criminal conduct, and other misconduct set forth in this Complaint, including the inevitability that Live Well would and did become unable to repay its repo lenders, the Transfers are also presumed to have been made with the actual intent to hinder, delay, or defraud creditors.

93.     The Transfers to Whiteford—purportedly pursuant to a self-interested, illegitimate, and void Guaranty and Indemnity Agreement—were part of Hild's effort to extract as much money and value as possible out of Live Well before he could be stopped.

94.     Indeed, Live Well received nothing of value in exchange for the Transfers.

95.     Based upon a review of the Debtor's books and records, there is no evidence Whiteford provided services to or represented Live Well before or after any of the challenged Transfers were made.

96.     Because the Guaranty and Indemnity Agreement was the product of fraud and multiple breaches of fiduciary duty, that agreement and any obligations of Live Well thereunder are void *ab initio*.

97.     The Transfers were also outside of the ordinary course of business for or in respect of Live Well.

98.     Defendant had notice of the fraudulent intent of its immediate grantor or of the fraud rendering void the title of such grantor because, among other things, such Defendant received substantial transfers from the Debtor for which it gave no consideration.

99.     Additionally, at the time of the Transfers, Live Well was deeply insolvent. By the time of the Transfers, Live Well owed in excess of $110 million in non-insider debts, which far exceeded the total value of its assets. And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the ever-growing dependence of Hild and his coconspirators on new bond repo lenders to repay old lenders, Live Well is also presumed to have been insolvent from the very inception of the fraudulent scheme beginning in 2015. Moreover, the Transfers were made after Live Well's business had collapsed and substantially all of its employees had been terminated.

100.     Before and after the date of each Transfer and as of the Filing Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged such Transfers.

101.     By reason of the foregoing, the Transfers (and any related obligation or undertaking under the Guaranty and Indemnity Agreement or similar agreement or document) constitute actual fraudulent transfers that should be avoided, unwound, and recovered and returned to Live Well's estate pursuant to Bankruptcy Code section 544 and applicable state law.

### THIRD CAUSE OF ACTION
### (Avoidance of Constructive Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(B))

102.     The Trustee incorporates each and every allegation contained in paragraphs 1 through 101 as though they were fully set forth herein.

103.    As set forth above and in the attached Exhibit A, on May 10, 2019, Michael Hild caused Live Well to transfer $50,000 to Whiteford.

104.    This Transfer came directly from one of Live Well's bank accounts, and Live Well had an interest in the property transferred.

105.    However, Live Well received nothing of value in exchange for the Transfer.

106.    Based upon a review of the Debtor's books and records, there is no evidence Whiteford provided services to or represented Live Well before or after the challenged Transfer was made.

107.    Because the Guaranty and Indemnity Agreement was the product of fraud and multiple breaches of fiduciary duty, that agreement and any obligations of Live Well thereunder are void *ab initio*.

108.    Moreover, as already explained above, at the time of the Transfer, Live Well was deeply insolvent. As a result of the fraudulent bond pricing scheme, Live Well was balance sheet insolvent by no later than June 2016, as the fair value of its liabilities far exceeded the fair value of its assets. By the time of the Transfer, Live Well owed in excess of $110 million in non-insider debts, which far exceeded the total value of its assets. And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the ever-growing dependence of Hild and his coconspirators on new bond repo lenders to repay old lenders, Live Well is also presumed to have been insolvent from the very inception of the fraudulent scheme beginning in 2015. Further, the Transfer was made after Live Well's business had collapsed and substantially all of its employees had been terminated.

109.    For the same reasons, the Transfer was made at a time when Live Well was undercapitalized.

110.     And the Transfer was made at a time when Live Well intended to incur or believed it would incur debts beyond its ability to repay as such debts matured.

111.     Defendant did not take for value or in good faith.

112.     By reason of the foregoing, the above Transfer (and any related obligation or undertaking under the Guaranty and Indemnity Agreement or similar agreement or document) constitutes actual constructive transfers that should be avoided pursuant to Bankruptcy Code section 548.

## FOURTH CAUSE OF ACTION
### (Avoidance of Constructive Fraudulent Transfers Pursuant to 11 U.S.C. § 544 and Applicable State Law, including without limitation 6 Del. Code § 1301, *et seq*., and Va. Code Ann. §§ 55-81, *et seq.*; 55.1-401, *et seq.*)

113.     The Trustee incorporates each and every allegation contained in paragraphs 1 through 112 as though they were fully set forth herein.

114.     As set forth above and in the attached Exhibit A, on May 10, 2019, Michael Hild caused Live Well to transfer $50,000 to Whiteford, and on June 11, 2019, Michael Hild caused Live Well to make two additional transfers, for $50,000 and $100,000, to Whiteford.

115.     Each of the Transfers came directly from one of Live Well's bank accounts, and Live Well had an interest in the property transferred.

116.     However, Live Well received nothing of value in exchange for the Transfers.

117.     Nor did Live Well did not receive fair consideration, consideration deemed valuable in law, or reasonably equivalent value in exchange for the Transfers.

118.     Based upon a review of the Debtor's books and records, there is no evidence Whiteford provided services to or represented Live Well before or after any of the challenged Transfers were made.

119.    Because the Guaranty and Indemnity Agreement was the product of fraud and multiple breaches of fiduciary duty, that agreement and any obligations of Live Well thereunder are void *ab initio*.

120.    Moreover, as already explained above, at the time of the Transfers, Live Well was deeply insolvent. As a result of the fraud scheme, Live Well was balance sheet insolvent by no later than June 2016, as the fair value of its liabilities far exceeded the fair value of its assets. By the time of the Transfers, Live Well owed in excess of $110 million in non-insider debts, which far exceeded the total value of its assets. And because of the pervasive fraud, criminal conduct, and other misconduct detailed in this Complaint, including the ever-growing dependence of Hild and his coconspirators on new bond repo lenders to repay old lenders, Live Well is also presumed to have been insolvent from the very inception of the fraudulent scheme beginning in 2015. Further, the Transfers were made after Live Well's business had collapsed and substantially all of its employees had been terminated.

121.    For the same reasons, each of the Transfers were made at a time when Live Well was undercapitalized and/or had unreasonably small capital.

122.    And each of the above Transfers was made at a time when Live Well had incurred, intended to incur, or believed it would incur debts beyond its ability to repay as such debts matured.

123.    Defendant had notice of the fraudulent intent of its immediate grantor or of the fraud rendering void the title of such grantor because, among other things, such Defendant received substantial transfers from the Debtor for which it gave no consideration.

124.    Before and after the date of each Transfer and as of the Filing Date, Live Well had at least one unsecured creditor holding an allowable claim that could have challenged such Transfers.

125.    By reason of the foregoing, the Transfers (and any related obligation or undertaking under the Guaranty and Indemnity Agreement or similar agreement or document) constitute actual constructive transfers that should be avoided, unwound, and recovered and returned to Live Well's estate pursuant to Bankruptcy Code section 544 and applicable state law.

**FIFTH CAUSE OF ACTION**
**(Recovery of Avoidable Transfers Pursuant to 11 U.S.C. § 550)**

126.    The Trustee incorporates each and every allegation contained in paragraphs 1 through 125 as though they were fully set forth herein.

127.    As detailed in this Complaint, the above-described Transfers to Whiteford are avoidable by the Trustee pursuant to sections 544 and 548 of the Bankruptcy Code.

128.    Whiteford is the initial transferee of all of the above-described transfers.

129.    Whiteford did not receive any of the Transfers in good faith.

130.    Whiteford knew or is charged with knowledge of the voidability of such Transfers.

131.    Live Well received no value in exchange for the Transfers.

132.    Accordingly, pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover from Whiteford the above-described Transfers, plus interest thereon to the date of payment and the costs of this action.

**RESERVATION OF RIGHTS**

133.    During the course of this proceeding, the Trustee may learn through discovery or otherwise of additional avoidable transfers made to or for the benefit of Whiteford or other claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law. It is the Trustee's intention to avoid and recover all avoidable transfers of property made by Live Well to or for the benefit of Whiteford or any other transferee. The Trustee reserves all rights to amend this original Complaint to include, among other things: (i) further information

regarding the Transfers; (ii) additional transfers; and/or (iii) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the filing of this original Complaint

## **CONCLUSION**

**WHEREFORE,** for the foregoing reasons, the Trustee respectfully requests the following relief:

A.      That the above-described Transfers (and any related obligation or undertaking under the Guaranty and Indemnity Agreement or similar agreement or document) and any other transfers subsequently identified through discovery or otherwise, be avoided as fraudulent transfers;

B.      That judgment be entered in favor of the Trustee against Whiteford in an amount to be determined, but not less than $200,000, for the monetary value of the above-described Transfers, plus interest pursuant to 11 U.S.C. § 550(a);

C.      That interest be awarded from the date of the Complaint;

D.      That fees and costs be awarded; and

E.      That the Trustee be granted such other and further legal and/or equitable relief as is just and proper.

Dated: June 28, 2021                BLANK ROME LLP

<u>/s/ Stanley B. Tarr</u>
Stanley B. Tarr
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Tel.: 302-425-6400
Fax: 302-425-6464
Tarr@BlankRome.com

and

Michael D. Silberfarb (admitted *pro hac vice*)
Huaou Yan (*pro hac vice* pending)
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103
Tel.: 215-569-5500
Fax: 215-569-5555
MSilberfarb@BlankRome.com
HYan@BlankRome.com

*Counsel for David W. Carickhoff,*
*the Chapter 7 Trustee*