**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*<br>LIVE WELL FINANCIAL INC.,<br><br>Debtor. | Chapter 7<br><br>Case No. 19-11317 (LSS) |
| DAVID W. CARICKHOFF, as Chapter 7<br>Trustee of LIVE WELL FINANCIAL, INC.,<br><br>Plaintiff,<br>v.<br><br>WEDBUSH SECURITIES, INC.<br><br>and<br><br>JOHN DOES 1–50;<br><br>Defendants. | Adv. Proc. No. __-_____-LSS ____ |

**COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

SUMMARY OF ACTION ........................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................. 4

PARTIES .................................................................................................................................. 4

RELEVANT THIRD PARTIES ............................................................................................. 5

FACTUAL ALLEGATIONS ................................................................................................. 6

    I.    Live Well Enters the Bond Trading Business ...................................................... 6

    II.    IDC's Independent Bond Valuations Create Liquidity Issues for Live Well. ...... 9

    III.    Live Well's Bond Business Turns into a Massive Fraud. ................................... 10

        A.    The Criminal Insiders Used Their Newfound Ability to Manipulate the Bond Prices to Avoid Margin Payments. ........................................... 10

        B.    The Criminal Insiders Expand the Fraudulent Price Fixing Scheme. ..... 11

    IV.    Suspicions of Wrongdoing and an SEC Investigation Spark Another Liquidity Crises and the Criminal Insiders Further Expand their Fraud. ............ 16

    V.    Wedbush Terminates its Repo Agreement with Live Well, and Live Well Fraudulently Transfers Over $120 Million to Wedbush. ................................... 21

    VI.    The Fraud Is Revealed, Live Well Collapses into Bankruptcy, and the Criminal Insiders are Found Guilty ................................................................... 25

CAUSES OF ACTION .......................................................................................................... 28

COUNT 1 ............................................................................................................................... 28

COUNT 2 ............................................................................................................................... 30

PRAYER FOR RELIEF ....................................................................................................... 30

David W. Carickhoff (the "Trustee"), as chapter 7 trustee of the bankruptcy estate of Live Well Financial, Inc. ("Live Well"), as and for his Original Complaint ("Complaint") against Wedbush Securities, Inc. ("Wedbush") and John Does 1–50 alleges the following:

## SUMMARY OF ACTION

1.    Through this action the Trustee seeks to avoid and recover over $120 million in fraudulent transfers that Live Well made to or for the benefit of Wedbush from June to October 2017. These transfers were made in furtherance of, and to conceal, a massive fraud perpetrated by certain former directors, officers, and employees of Live Well—principally, Michael Hild, Eric Rohr, and Darren Stumberger (the "Criminal Insiders")—each of whom has either pleaded guilty to, or has been found guilty of, multiple counts of securities, wire, and bank fraud, and conspiracy to commit the same, in connection with the fraud described herein.

2.    Live Well was founded as a private financial services company that primarily originated and serviced reverse mortgages. In 2014, however, at the direction of the Criminal Insiders, Live Well began acquiring a large portfolio of relatively illiquid interest only bonds financed through repurchase (repo) agreements—a form of short-term financing structured as the sale of an asset along with an agreement to repurchase it from the buyer after a particular term. Shortly thereafter, the Criminal Insiders transformed Live Well's burgeoning bond trading business into a massive fraud that inevitably destroyed the company and left Live Well's creditors with over $110 million in unsecured debt.

3.    The fraud at the center of this case was a straight-forward bond price-fixing scheme. The Criminal Insiders purchased bonds at market prices, fraudulently inflated the values of the bonds in Live Well's portfolio, caused Live Well to incur more debt than the bonds were worth by leveraging the bonds based upon the inflated values, then caused Live Well to use the borrowed

cash to, among other things, generate cash to meet Live Well's liquidity needs and purchase more bonds at market prices.  The Criminal Insiders then fraudulently inflated the values of Live Well's newly acquired bonds and repeated the process again and again.  As a result, Live Well's liabilities steadily grew over time, and Live Well became more and more insolvent.

4.      Nevertheless, in this manner, the Criminal Insiders dramatically increased both the number of bonds in Live Well's portfolio, from 18 to approximately 50, and the apparent value of the bond portfolio, from $50 million in late 2014 to over $500 million, in less than three years.

5.      Because the amounts Live Well borrowed against the inflated values of the bonds were substantially greater than the bonds' true market values, Live Well suffered a liquidity crisis any time any of Live Well's lenders reduced Live Well's line of credit or requested that Live Well repurchase the bonds pursuant to the terms of the repo agreements.

6.      To resolve these liquidity crises, which became a recurring problem for Live Well by 2017, the Criminal Insiders sought out new victims, whom they defrauded into extending credit to Live Well through new repo agreements based upon the inflated bond values.  The Criminal Insiders then used these new repo credit facilities to fund payments due under older repo agreements, further expand the fraud, and dig Live Well deeper and deeper into debt (and rendering the company more and more insolvent).  Thus, under the management of the Criminal Insiders, Live Well's bond trading business quickly turned into a *de facto* Ponzi scheme that required defrauding new victims, or expanding credit lines with current victims, to pay off the debts owed to earlier victims, while the chasm between the real value of Live Well's assets and its increasing liabilities grew wider and wider.

7.      By at least August 2017, if not sooner, Wedbush—one of Live Well's preferred repo counterparties that, at the time, had provided Live Well a $100 million credit limit under its

repo agreement with the company—had caught wind of an ongoing Securities and Exchange Commission ("SEC") investigation into Live Well's bond trading business, or had otherwise begun to suspect that the bonds it was financing were dramatically overvalued. As a result, Wedbush wanted Live Well's bonds off its books as quickly as possible and began requiring Live Well to repurchase all of the bonds pursuant to the terms of its repo agreement.

8.      Live Well did not have the liquidity to repurchase the bonds and, because the bonds were financed based upon materially inflated prices, Live Well could not simply sell the bonds to repay Wedbush. As such, Live Well was at risk of defaulting under its repo agreement with Wedbush. Any such default, however, would create defaults under all of Live Well's borrowing arrangements with its other lenders and would thus result in the entire fraudulent scheme collapsing.

9.      To stave off the inevitable, the Criminal Insiders sought out new victims from whom they could borrow the funds necessary pay off Wedbush. This, however, could not be accomplished overnight. Live Well needed more time to secure the necessary funding and, to increase their chances of getting repaid in full at the expense of new victims, Wedbush complied.

10.      Over the next several months, Live Well managed to secure the funds necessary to repay Wedbush by defrauding new victims and otherwise increasing its liabilities by further expanding its credit lines with its current victims. By October 2017, Live Well had fully repaid Wedbush with the funds provided by these victims.

11.      Each of the transfers Live Well made to Wedbush to repurchase its fraudulently overvalued bonds was made with actual intent to hinder, delay, or defraud Live Well's creditors because the transfers were made both in furtherance of and to conceal the Criminal Insiders' fraudulent bond price-fixing scheme. And by prolonging the scheme, those payments had the

3

effect of worsening Live Well's financial condition and increasing the inevitable shortfall of assets available for Live Well's victims and creditors when the scheme finally collapsed, thereby harming such creditors.

12.    As such, the Trustee seeks to avoid and recover each of these transfers pursuant to 11 U.S.C. 548(a)(1)(A) and 550(a) for the benefit of the Live Well estate and its creditors.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b), in that the Complaint asserts causes of action arising in, arising under and/or relating to the above-captioned bankruptcy case.

14.    This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2) to be heard and determined by this Court, and this Court may enter final orders for matters therein.  In the alternative, this proceeding is a "related to" proceeding under 28 U.S.C. § 157(a).

15.    Venue for the action is proper in this Court under 28 U.S.C. § 1409(a), as the action is commenced in the district in which the above-captioned bankruptcy case is pending.

16.    The Trustee consents to the entry of final orders or judgments by this Court if it is determined that, absent consent of the parties herein, this Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PARTIES

17.    The Trustee, David W. Carickhoff, is the chapter 7 bankruptcy trustee of Live Well Financial, Inc.  Live Well Financial, Inc., is a Delaware corporation and, while operating, its principal place of business was in Richmond, Virginia.

18.    Defendant Wedbush Securities, Inc. is a California corporation headquartered in Los Angeles.  Wedbush provides, among other things, brokerage, clearing, investment banking,

equity research, public finance, fixed income, futures and commodities, sales and trading, and asset management services to individual and institutional clients.  As relevant here, Wedbush also provided financing to Live Well through repo agreements in connection with Live Well's bond trading activities.

## RELEVANT THIRD PARTIES

19.    Michael C. Hild was the founder of Live Well and served as its Chairman and Chief Executive Officer from 2005 through May 2019.  In such capacity, Hild oversaw all operations of the company and reported directly to the board of directors.  On April 30, 2021, Hild was convicted by a jury of his peers in the United States District Court for the Southern District of New York for: (i) conspiracy to commit securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud in connection with the fraudulent bond price-fixing scheme described herein.  Hild is currently awaiting sentencing.

20.    Eric G. Rohr was the Chief Financial Officer of Live Well from 2008 through his resignation in December 2018.  Rohr oversaw several of Live Well's departments, including financial planning and analysis, accounting, human resources, compliance and risk management, funding, post-closing, and servicing oversight.  Rohr reported directly to Hild and to the board of directors of Live Well.  On or about August 23, 2019, Rohr pleaded guilty to: (i) conspiracy to commit securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud in connection with the fraudulent bond price-fixing scheme described herein and agreed to be a cooperating witness in connection with the government's prosecution of Hild.

21.    Charles Darren Stumberger was an Executive Vice President of Live Well from September 2014 through his resignation in March 2019.  Stumberger served as the manager of

Live Well's bond portfolio.  Stumberger reported directly to Hild and also took direction from Rohr.  On or about August 27, 2019, Stumberger pleaded guilty to: (i) conspiracy to commit securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud in connection with the fraudulent bond price-fixing scheme described herein and agreed to be a cooperating witness in connection with the government's prosecution of Hild.

22.     Hild, Stumberger, and Rohr are collectively referred to herein as the "Criminal Insiders."

## FACTUAL ALLEGATIONS

### I.     Live Well Enters the Bond Trading Business

23.     Live Well was founded in 2005 as a private financial services company.  For the first nine years of its operations, Live Well primarily operated two related lines of business: originating Home Equity Conversion Mortgages ("HECMs"), more commonly known as "reverse mortgages," and servicing those mortgages.

24.     In or around August 2014, Stumberger approached Hild about expanding Live Well's business by establishing a trading desk to invest in HECM IO (Home Equity Conversion Mortgage, Interest Only) bond strips.

25.     HECM IO bonds are reverse mortgage-backed securities that entitle the holder to receive a portion of the interest payments, but not principal payments, from a particular pool of reverse mortgage loans and pay the holder a monthly "coupon" (effectively, an interest rate) based upon the performance of the underlying reverse mortgage loans.

26.     Stumberger worked at the HECM trading desk at Stifel Nicolaus ("Stifel"), a New York-based investment bank and broker dealer, and thus had knowledge about the market for

HECM IO bonds.  Stifel had decided to exit the HECM trading business and was looking to sell its portfolio.

27.    Stumberger and Hild soon began working toward a deal for Live Well to acquire a portfolio of approximately 18 HECM IO bond strips from Stifel for approximately $46 million and for Stumberger and several members of his team to leave Stifel and join Live Well to manage the portfolio.

28.    First, however, Live Well needed to work out arrangements with various counterparties to finance its bond purchases.

29.    To finance both its initial acquisition of the HECM IO bond portfolio from Stifel and all subsequent bond acquisitions (collectively, the "Live Well Bonds"), Live Well entered into a series of bond repurchase ("repo") agreements with various parties.

30.    A repo agreement is a short-term borrowing facility structured as a sale and repurchase of a certain security.  Whereas in a traditional loan, the financed securities serve as collateral and security for the repayment of the loan, in a repo transaction, the purchaser (sometimes referred to as the "repo lender") buys the securities from the seller (sometimes referred to as the "borrower") and thus owns them subject to the terms of their agreement.  The seller, however, agrees to buy the securities back (*i.e.*, repurchase them) from the repo lender at a specified time and for a specified price pursuant to the terms of the repo agreement.

31.    To determine the purchase price of the bonds (*i.e.*, the loan amount), Live Well's repo lenders took the then-current value of the bonds to be sold and applied a discount, or "haircut," typically in a range of 10 to 20% of the value.  Thus, if the value of the financed bonds was $10 million, the repo lender would "lend" between $8 and $9 million, depending on the terms of the relevant repo agreement.  In other words, the repo lender would purchase the bonds from Live

Well for 80 to 90% of their current value, and Live Well would agree to buy them back on a certain date for the total purchase price plus interest and fees.

32.     This "haircut" provided protection to the repo lenders because, if Live Well defaulted on its obligations, the repo lenders could liquidate the bonds to satisfy the amounts due under the repo agreement.  Thus, the haircut was intended to ensure that the proceeds of a sale of the bonds would be sufficient to satisfy Live Well's obligations under the repo agreement.

33.     Moreover, the repo lender would typically set a credit limit (sometimes referred to herein as a "repo credit limit" or a "repo line of credit") and agree to purchase bonds from Live Well, subject to the terms of the repo agreements, for an amount determined by the fair market value of the bonds, minus the haircut, up to that credit limit.  Thus, the credit limit—determined based upon the creditworthiness of Live Well as determined by the repo lender—effectively capped Live Well's borrowing capacity from any particular repo lender at a set amount.  Once Live Well reached its limit with one repo lender, it had to look elsewhere—*i.e.*, find new repo lenders—for additional borrowing capacity if it wanted to finance additional bonds.

34.     Because, like most securities, the market value of the HECM IO bonds subject to repo agreements at issue here could fluctuate up or down, the repo transactions included two-way "margin" requirements that would effectively increase or decrease the amount of the "loan" or purchase price by the amount of margin.  According to the terms of the repo agreement, if the market price of the bond went down, Live Well would be required to post margin (*i.e.*, make a payment) to the repo lender in an amount proportional to the decrease in the value of the bond— thereby decreasing the purchase price of the bond (or "loan amount").  Such transfers, referred to as "margin calls," were intended to maintain the haircut at the agreed upon level.  Conversely, if

the market price went up, Live Well could borrow more against the bond—thereby increasing its purchase price—up to the credit limit set by the repo lender.

35.     Thus, determining an objective and unbiased daily value of the bonds, and reaching an agreement on how the bonds would be valued, was a material issue for Live Well's repo lenders—both at the time of purchase and throughout the duration of the repo agreement.

36.     Hild understood that obtaining third-party valuations of the bonds posed a significant hurdle to Live Well's ability to finance its bond purchases and effectively engage in the bond trading business.  Without truly independent bond valuations, repo lenders would not agree to finance the purchase, or loan funds against the value, of the bonds.  Obtaining an objective pricing source was particularly important and challenging because the HECM IOs that Live Well purchased are relatively illiquid, thinly traded, and often not found in pricing service databases.

37.     To resolve this issue, Live Well turned to Interactive Data Pricing and Reference Data LLC ("IDC")—one of the few securities pricing services that published prices for these HECM IO bonds.  With IDC's commitment to cover and publish prices for the Live Well Bonds, Live Well was able to obtain repo financing for its bond purchases.

38.     Thus, in or around November 2014, Live Well began its bond trading business by completing its purchase of 18 HECM IO bond strips from Stifel for approximately $46 million financed through repo agreements with three separate repo lenders.  Upon acquiring the bond portfolio from Stifel, Live Well hired Stumberger and several members of the team from Stifel that had managed the bond portfolio.

## II.     IDC's Independent Bond Valuations Create Liquidity Issues for Live Well.

39.     Live Well's new bond trading business got off to a shaky start.  For the first several months, IDC published objective, independent market-based prices for the Live Well bonds.  And those bond prices, determined by IDC's own independent methodology, fluctuated up and down

9

based upon objective market conditions.  These fluctuations resulted in Live Well's frequent receipt of margin calls from its repo lenders.

40.    The margin calls created significant liquidity challenges for Live Well.  For example, in February 2015, IDC's published prices caused a $30,000 day-over-day reduction in the value of the bond portfolio, which had caused an implied margin call of $247,000.  Hild desperately searched for a solution that would smooth out the daily changes in the bond prices and allow him to better avoid liquidity problems and manage Live Well's cash flows.  To this end, Hild tasked Stumberger with putting a stop to the price volatility.

41.    On February 12, 2015, Stumberger reported back to Hild that he "just had an all-hands-on call with IDC.  This issue is solved." He explained, "We will be supplying prices daily to IDC, and IDC will use these."  Stumberger assured Hild, **"They will use the prices verbatim and not model these bonds until we are interested in them doing so"** (emphasis added).

42.    For all relevant times thereafter, IDC ceased using its own pricing model and started publishing the prices provided by the Criminal Insiders verbatim.

**III.    Live Well's Bond Business Turns into a Massive Fraud.**

43.    With IDC's agreement to publish the prices for the Live Well Bonds submitted by Live Well as "broker quotes," the Criminal Insiders' management of Live Well's bond portfolio quickly turned into a massive fraud that Hild would later describe as a "self-generating money machine."

     **A.    The Criminal Insiders Used Their Newfound Ability to Manipulate the Bond Prices to Avoid Margin Payments.**

44.    The Criminal Insiders started to fraudulently inflate the prices of the Live Well Bonds on *the very same day* that IDC agreed to publish the prices they submitted.

45.     The Criminal Insiders started out small, however, testing the limits of IDC's willingness to publish the bond prices they provided.  For example, immediately after IDC agreed to accept Live Well's prices, Hild directed Stumberger to submit prices that would "[u]ndo the $30K incorrect day over day reduction up to this point," to avoid the implied margin call of $247,000.  Stumberger replied, "We can mark everything up by 1.25 ticks to erase out the IMC [implied margin call]."

46.     Stumberger submitted the prices with the adjustments as Hild directed.  Upon confirmation that "IDC marks are up ~$250k today for tmrw's distribution," Hild mused, "Well that was easy :-)".

47.     Thus, the Criminal Insiders prevented a margin call by manipulating the prices published by IDC, not based on any analysis of the bonds' actual market value, but rather based solely on Live Well's liquidity needs.  Live Well's repo lenders, who at the time had no idea IDC was no longer independently valuing the bonds, continued to accept IDC's prices as representative of the fair market value.

48.     With demonstrated control over the published bond prices, the Criminal Insiders knew they could eliminate the risk of the unpredictable margin calls that created liquidity crises and strains on cash flows. This created the false appearance that the new bond trading business was performing well.  And with the fear of unpredictable margin calls effectively eliminated, from February 2015 through August 2015, Live Well purchased more bonds and increased the reported value (*i.e.*, the value based upon the fraudulently inflated bond prices) of its bond portfolio from $50 million to $71 million.

**B.     The Criminal Insiders Expand the Fraudulent Price Fixing Scheme.**

49.     Up to around August 2015, the Criminal Insiders had primarily used their ability to unilaterally set the bond prices to smooth out the daily fluctuations in the "market price."  They

eventually realized, however, that they could manipulate the IDC published bond prices to dramatically inflate the apparent value of the Live Well Bonds.

50.     Indeed, after their first successful bond price manipulation, Stumberger and the bond trading desk began modeling various "scenarios"—*i.e.*, sets of "assumptions" and parameters—for valuing the Live Well Bonds to maximize their "value" without regard for their true market prices or any objective market data.

51.     Specifically, in or about August or September 2015, the Criminal Insiders developed a pricing model they referred to internally as "scenario 14." Scenario 14 fundamentally changed the way Live Well valued the Live Well Bonds, and the Criminal Insiders used scenario 14 to generate the values they submitted to IDC. Among other things, scenario 14 "assumed" a dramatic drop in the bond yields (*i.e.,* the return on the bonds demanded by the market), which resulted in a dramatic increase in the purported "value" of the bond portfolio.

52.     Neither the "assumptions" underlying scenario 14 nor the dramatic increase in bond valuations that scenario 14 generated had any market basis whatsoever. To the contrary, the inflated bond prices generated by scenario 14, and that the Criminal Insiders submitted to IDC, were false, misleading, and could never actually be obtained in the market.

53.     Nevertheless, by submitting the fraudulently inflated bond prices to IDC, the Criminal Insiders dramatically expanded Live Well's bond portfolio and increased its reported value (*i.e.*, the value based upon the marks generated by scenario 14 and published by IDC) from $71 million to $141 million in September 2015 alone.

54.     To accomplish this rapid expansion, the Criminal Insiders used scenario 14 to inflate the "market prices"—*i.e.*, the prices published by IDC—of newly acquired bonds

immediately after purchasing them and then engaged in repo transactions with the bonds based upon the inflated values.

55.    The key to this fraud was finding repo lenders that would agree to rely exclusively on IDC's published prices to determine the values of the bonds subject to the repo agreements. Accordingly, the Criminal Insiders specifically targeted repo lenders that relied solely on IDC for bond prices, even if those repo lenders offered financing terms that were less favorable than those of lenders that obtained bond prices from sources other than IDC.

56.    Because the Criminal Insiders had complete control over the bond prices submitted to IDC, they could set the published bond prices to whatever they wanted and, by extension, fraudulently manufacture increased credit from the repo lenders.

57.    The Criminal Insiders ran this play again and again—causing Live Well to borrow funds based upon fraudulently inflated bond values to purchase more bonds, then inflating the values of the newly acquired bonds to purchase even more bonds, and so on.  Using this scheme, Live Well increased the size of its bond portfolio from its initial portfolio of 18 HECM IO bonds to 50.  In the process, Live Well's liabilities grew larger and larger, and Live Well became more and more insolvent as the chasm between the true fair market value of the bonds and Live Well's liabilities continued to expand.

58.    Beginning in September 2015, the Criminal Insiders consistently submitted prices to IDC that were on average 29% higher than the purchase price Live Well paid for the bonds in arms-length market transactions.  The Criminal Insiders submitted the inflated prices to IDC often on the same day Live Well had purchased the bonds for substantially less.  The following table demonstrates the mechanics of the inflation scheme:

| Purchase Date | Bond | Purchase Price | Date of Submission to IDC | Value Submitted to IDC | Percentage Inflation in Value |
|---|---|---|---|---|---|
| 09/11/2015 | GNR 2015-H14 AI | $ 12.8125 | 09/14/2015 | $ 15.3750 | 20.00% |
| 09/15/2015 | GNR 2013-H08 DI | $ 10.3906 | 09/15/2015 | $ 12.0469 | 15.94% |
| 09/15/2015 | GNR 2015-H16 DI | $ 13.6406 | 09/15/2015 | $ 16.8750 | 23.71% |
| 09/28/2015 | GNR 2015-H23 AI | $ 12.4063 | 09/28/2015 | $ 14.9700 | 20.66% |
| 09/17/2015 | GNR 2015-H12 BI | $ 12.4531 | 09/18/2015 | $ 14.7031 | 18.07% |
| 09/21/2015 | GNR 2015-H12 BI | $ 12.4531 | 09/18/2015 | $ 14.7031 | 18.07% |
| 09/28/2015 | GNR 2015-H22 CI | $ 12.7813 | 09/29/2015 | $ 15.6400 | 22.37% |
| 09/24/2015 | GNR 2015-H17 AI | $ 13.0000 | 09/25/2015 | $ 16.0938 | 23.80% |
| 09/24/2015 | GNR 2015-H06 DI | $ 11.0000 | 09/25/2015 | $ 14.1875 | 28.98% |
| 09/24/2015 | GNR 2015-H08 BI | $ 11.4375 | 09/25/2015 | $ 14.0313 | 22.68% |
| 10/07/2015 | GNR 2015-H08 BI | $ 11.3438 | 10/12/2015 | $ 14.6665 | 29.29% |
| 11/04/2015 | GNR 2015-H27 AI | $ 11.7500 | 11/04/2015 | $ 14.2500 | 21.28% |
| 11/13/2015 | GNR 2015-H29 JI | $ 12.1406 | 11/24/2015 | $ 15.3750 | 26.64% |
| 11/17/2015 | GNR 2015-H29 BI | $ 11.3125 | 11/24/2015 | $ 14.5626 | 28.73% |
| 12/01/2015 | GNR 2015-H30 CI | $ 11.6250 | 12/01/2015 | $ 15.4375 | 32.80% |
| 12/02/2015 | GNR 2015-H26 BI | $ 12.1250 | 12/02/2015 | $ 16.0625 | 32.47% |
| 12/03/2015 | GNR 2015-H28 BI | $ 9.2500 | 12/03/2015 | $ 11.8438 | 28.04% |
| 12/30/2015 | GNR 2015-H32 MI | $ 9.6906 | 12/30/2015 | $ 12.4375 | 28.35% |
| 12/30/2015 | GNR 2015-H32 AI | $ 11.9063 | 12/30/2015 | $ 15.8750 | 33.33% |
| 01/04/2016 | GNR 2015-H33 AI | $ 12.1094 | 01/04/2016 | $ 15.8750 | 31.10% |
| 02/25/2016 | GNR 2016-H04 DI | $ 10.9177 | 02/25/2016 | $ 14.7813 | 35.39% |
| 03/21/2016 | GNR 2016-H07 KI | $ 11.0938 | 03/25/2016 | $ 14.8750 | 34.08% |
| 04/01/2016 | GNR 2016-H07 KI | $ 11.2813 | 03/25/2016 | $ 14.8750 | 31.86% |
| 05/05/2016 | GNR 2016-H09 NI | $ 12.0625 | 05/10/2016 | $ 16.1894 | 34.21% |
| 05/11/2016 | GNR 2016-H11 LT | $ 1,643.00 | 05/25/2016 | $ 2,123.09 | 29.22% |
| 05/27/2016 | GNR 2016-H11 LM | $ 1,608.00 | 05/31/2016 | $ 2,054.03 | 27.74% |
| 06/08/2016 | GNR 2016-H11 LG | $ 1,608.00 | 06/08/2016 | $ 2,098.23 | 30.49% |
| 07/27/2016 | GNR 2016-H16 LX | $ 1,476.45 | 07/26/2016 | $ 1,930.75 | 30.77% |
| 08/26/2016 | GNR 2016-H17 AI | $ 14.4797 | 08/26/2016 | $ 20.0533 | 38.49% |
| 09/12/2016 | GNR 2016-H11 MI | $ 11.6875 | 09/12/2016 | $ 17.0620 | 45.99% |
| 09/29/2016 | GNR 2016-H17 BI | $ 12.1016 | 09/29/2016 | $ 17.1250 | 41.51% |
| 09/29/2016 | GNR 2016-H07 GI | $ 11.0000 | 09/29/2016 | $ 15.2813 | 38.92% |
| 10/25/2016 | GNR 2016-H23 MI | $ 15.1250 | 10/26/2016 | $ 18.2094 | 20.39% |
| 10/28/2016 | GNR 2016-H11 JI | $ 11.8438 | 10/31/2016 | $ 14.5313 | 22.69% |
| 11/29/2016 | GNR 2016-H24 BI | $ 14.2656 | 11/29/2016 | $ 17.7500 | 24.42% |
| 11/29/2016 | GNR 2016-H23 BI | $ 11.3281 | 11/29/2016 | $ 14.5625 | 28.55% |

59.     As discussed above, Live Well's repo lenders typically applied a haircut of between 10% and 20% to the quoted bond prices.  But because the Criminal Insiders were fraudulently marking up the bonds by an average of 29%, the repo lenders frequently (and unknowingly) were underwater on the day they made the loans.

60.     Moreover, when Live Well required additional liquidity to purchase more bonds or repurchase bonds from their repo lenders, they simply submitted prices based on the amount of money they wanted to "harvest" from margin calls issued to repo lenders.  For example, in January 2016, a trading desk employee reported in an email, "[a]s it sits in IDC right this second we could harvest 850k.  Depending on which exact prices we want to export itd [sic] be an additional 3.3-4.2M on top of that."  Accordingly, the Criminal Insiders could, and routinely did, simply manipulate the prices given to IDC to produce the amount of cash they desired.

61.     Hild aptly described this scheme on a phone call with employees on Live Well's bond trading desk: "***it is a little bit of a self-generating money machine, right?***  In that if you buy [HECM IO bonds] in the marketplace and then apply this methodology, ***every single time you do that, you're gonna free up additional borrowing capacity, right?***" (emphasis added).

62.     Between September 2015 and November 2016, Live Well borrowed hundreds of millions of dollars from its repo lenders based upon fraudulently inflated bond prices generated by scenario 14 and submitted to IDC by the Criminal Insiders.  Indeed, from September 2015 to December 2016, using the scheme described above, Live Well increased the amount of its bond-related borrowings, obtained from repo lenders, from $124 million to over $430 million.  Of course, because the amount of these borrowings was based, in part, upon the fraudulently inflated bond prices, the actual value of the Live Well Bonds that "collateralized" these debts was far less

than $430 million.  And the amount by which Live Well's outstanding liabilities exceeded the actual value of the bonds increased over time.

63.     Over the next two years, the Criminal Insiders continued to expand their fraud, increasing the size and apparent value of the bond portfolio to generate more borrowing capacity and more cash, all to satisfy Live Well's increasing liquidity needs—needs driven, in great part, by the Criminal Insiders' ever increasing compensation requirements.

**IV.    Suspicions of Wrongdoing and an SEC Investigation Spark Another Liquidity Crises and the Criminal Insiders Further Expand their Fraud.**

64.     Throughout the course of the scheme, the Criminal Insiders needed new repo lenders—*i.e.*, new victims—to continue to perpetrate their scheme and to pay down existing repo credit lines from repo lenders that wanted to reduce their exposure to the Live Well bonds.

65.     For example, in early 2015, Live Well had three repo lenders.  By mid-2015 (after the Criminal Insiders had obtained exclusive control over the bond prices published by IDC), each of those three counterparties had sought to reduce or eliminate their exposure to the bonds.  Thus, as would become their pattern, the Criminal Insiders sought out repo financing from new repo lenders to get the necessary liquidity to pay off Live Well's old repo lenders (*i.e.*, repurchase the financed bonds).  Like in a Ponzi scheme, in other words, the Criminal Insiders used money fraudulently obtained from "new" creditors to repay obligations owed to previously defrauded "old" creditors.

66.     By the end of 2015, when the Criminal Insiders first began to ramp up their fraud, the Live Well Bonds were primarily subject to repo agreements with two repo lenders—Wedbush and Mizuho Securities USA Inc. ("Mizuho").  Significantly, both Wedbush and Mizuho had agreed to use IDC to obtain third-party pricing for the bonds they purchased through their repo agreements with Live Well.  At that time, Live Well also financed some of the Live Well Bonds

through a repo agreement with Nomura.  Nomura, however, priced the bonds itself and did not use IDC.  Thus, Live Well typically used Nomura to finance the bonds only as an option of last resort.

67.    During 2016, Live Well found at least two additional repo lenders (Industrial and Commercial Bank of China ("ICBC") and Customers Bank) to expand its overall credit capacity and thus the magnitude of its fraud.  Nevertheless, by the end of 2016, Wedbush and Mizuho remained two of Live Well's most significant repo lenders.  Indeed, as of December 2016, Wedbush and Mizuho had extended approximately $225 million and $85 million, respectively, in repo loans to Live Well based upon the fraudulently inflated bond prices published by IDC.  Moreover, based upon the size of the credit limit and the relatively low haircut it applied to the bond values subject to its repo agreement with Live Well, Wedbush was Live Well's preferred repo lender.

68.    Thus, in January 2017, when Wedbush first began expressing concerns about the valuations of the Live Well Bonds as reported by IDC, Live Well and the Criminal Insiders went into crisis mode.  Specifically, Scott Skyrm, Wedbush's relationship manager for the Live Well account, told Live Well that he needed to spot check the bond prices listed by IDC and requested the name of a broker dealer that could verify the market prices.

69.    The Criminal Insiders knew that if Wedbush checked the prices with any reputable broker dealer it would discover that the Live Well Bonds were grossly overvalued and could not cover the amounts Live Well owed to Wedbush under the repo agreement.  Nevertheless, with no other options, Live Well provided Wedbush with the names of at least two broker dealers.

70.    Shortly thereafter, by the end of January 2017, Wedbush sought to remove some of the Live Well Bonds from Live Well's repo line of credit by requiring that Live Well repurchase them.  Live Well, however, did not have the liquidity to repurchase the bonds and, because the

repurchase price of the bonds far exceeded what they could be sold for in the market, Live Well could not simply sell the bonds to pay the debt it owed to Wedbush.

71.     Thus, Live Well had to move these bonds to different repo lenders to get the financing necessary to pay off Wedbush or risk being in default under the repo agreement. Defaulting under the Wedbush repo agreement would have had disastrous results for both Live Well and the Criminal Insiders.  Indeed, it would have created defaults under all of Live Well's repo agreements, and thus would likely have ended the company and exposed the Criminal Insiders' fraud and Live Well's hopeless insolvency.  Thus, the Criminal Insiders were desperate to avoid that outcome and lobbied Wedbush for more time to find/create additional borrowing capacity with other repo lenders.  Wedbush, acting in its own self-interest to ensure full repayment, complied, notwithstanding, upon information and belief, its understanding that Live Well's bonds were overvalued.

72.     But this was not the only liquidity crisis Live Well suffered during the first quarter of 2017.  Wedbush, although willing to give Live Well some time to repurchase the bonds that it no longer wished to finance, was now clearly suspicious of the Live Well Bond valuations.  As a result, Wedbush increased the haircut it applied to the IDC bond prices from 10% to 15%, placed the Live Well Bonds on "open" (meaning that Wedbush could require Live Well to repurchase any or all of the bonds subject to the repo agreement at any time), and reduced Live Well's credit limit by $100 million—from $225 million down to $125 million—thereby requiring Live Well to find even more capital to move additional bonds off the Wedbush repo line of credit.

73.     Then, to make matters even worse, in or about March 2017, Mizuho informed Live Well that it was terminating its repo loans.  This forced Live Well to repurchase all of the bonds it

had financed under the repo agreement.  To repurchase the Live Well Bonds from Mizuho, Live Well had to come up with over $91 million.

74.    Not coincidentally, in March 2017, the Securities and Exchange Commission ("SEC") opened an investigation into Live Well's bond trading activities.  Upon information and belief, Wedbush's reduction in its repo line of credit to, and Mizuho's termination of its repo agreement with, Live Well was due, in part, to the SEC contacting them in connection with the SEC's investigation of Live Well.

75.    Because Live Well was insolvent and did not have the liquidity necessary to repurchase its bonds from Wedbush and Mizuho, it had to find more borrowing capacity from other repo lenders who would agree to purchase (*i.e.*, lend against) the bonds.  Live Well accomplished this during February and March 2017, by moving the bonds to two of its existing repo lenders, ICBC and Nomura, and one new victim, Flagstar Bank FSB ("Flagstar").  In other words, Live Well repurchased the bonds from Wedbush and Mizuho using the proceeds it received from fraudulently selling those bonds to ICBC, Nomura, and Flagstar.

76.    Moving the bonds to other repo lenders, however, did not completely solve Live Well's liquidity problem.  Live Well still required a substantial amount of cash to close out its repos with Wedbush and Mizuho because the other repo lenders had higher haircuts.  Furthermore, Nomura, who increased its repo loan amount to Live Well from approximately $6 million to $74 million during this time-period, did not accept IDC prices and lent at a significant discount from the prices IDC published.  Thus, moving bonds to Nomura would not generate sufficient funds to fully payoff—*i.e.*, repurchase the bonds from—Wedbush and Mizuho because Wedbush and Mizuho purchased the bonds based upon significantly higher valuations.

77.     To generate the cash it needed to close its repo positions with Wedbush and Mizuho, the Criminal Insiders once again raised the bond prices published by IDC.  Because scenario 14 did not generate sufficiently high bond prices to create the liquidity they needed, the Criminal Insiders created an entirely new scenario—"scenario 4"—to generate the new bond prices they would submit to IDC.  Scenario 4 abandoned any pretense of using a methodology to value the bonds and instead simply backed into whatever number they needed.  For example, between January 2017 and February 2017, the value of the bond portfolio increased by $32.4 million, and between February 2017 and March 2017, the value of the bond portfolio increased by an additional $21 million, even though the portfolio consisted of the exact same bonds and even though the values of HECM IO bonds naturally decline over time as the mortgages underlying the bonds payoff.

78.     Using scenario 4 prices, however, increased the risk that the fraud would be uncovered because the prices bore no relationship to reality.  As just one example, on or about March 17, 2017, a Live Well employee acting at the direction of Criminal Insiders increased the price quotes submitted to IDC of five bonds by exactly $1 each and increased the price on a sixth bond by exactly $0.50.  There was no analysis conducted to even nominally support those blanket increases in the valuations.  Rather, they were dictated exclusively by an immediate need for cash. That employee testified at Hild's criminal trial that he intentionally submitted these obviously fraudulent bond price quotes in hopes that someone would notice and intervene because "***my opinion was that this was really wrong and I wanted Live Well to get caught*** . . . ." (emphasis added).

79.     On a March 30, 2017 call with Hild, Stumberger and others, Rohr warned that the bond prices were "getting farther and farther away from reality, I guess, or the center of the

universe."  Indeed, the "scenario 4" prices were so far from reality that, by March 24, 2017, the bond prices submitted to IDC by the Criminal Insiders were ***45.7% higher*** than the bond prices that were used by Nomura, Live Well's only repo lender that did not rely on IDC pricing.

80.     Although the Criminal Insiders managed to survive their liquidity crises during the first quarter of 2017 by expanding their fraud, further inflating the Live Well Bond prices, and by finding at least one new victim, Flagstar, to provide Live Well with repo-financing based upon the fraudulently inflated bond prices, Wedbush and the SEC investigation continued to be a problem.

81.     Indeed, throughout the second quarter of 2017, Wedbush further decreased Live Well's repo credit limit from $125 million down to $100 million.  The Criminal Insiders first accommodated this decrease in borrowing capacity by increasing its repo-borrowing from Nomura.  Of course, because Nomura did not accept IDC prices (*i.e.*, the fraudulently inflated bond prices), moving bonds from Wedbush to Nomura required the Criminal Insiders to generate more cash by further increasing the bond prices published by IDC and defrauding new creditor victims.

### V.    Wedbush Terminates its Repo Agreement with Live Well, and Live Well Fraudulently Transfers Over $120 Million to Wedbush.

82.     By July 2017, the Criminal Insiders managed to find yet another new victim— Mirae Asset Securities (USA) Inc. ("Mirae")—of their fraudulent bond price-fixing scheme.

83.     Shortly before Mirae began providing repo financing to Live Well, on July 19, 2017, the SEC issued a subpoena to Live Well.  As a result of the SEC's scrutiny, the Criminal Insiders stopped further inflating the bond prices and generally maintained the prices at the then-current levels.  But by that point, the bonds were already grossly overvalued and Live Well was hopelessly insolvent.

84.     As such, in March 2017, when Mirae began its due diligence on Live Well to determine its creditworthiness, the values of the bonds that Mirae would purchase under any repo agreement were already materially and significantly inflated.  Similarly, because Live Well carried the bonds on its books based upon the IDC-published prices, the values of the assets reflected on Live Well's financial statements were also materially overstated.

85.     Mirae reasonably relied upon Live Well's certified audited financial statements and the fraudulently reported value of the bonds in making its decision to extend repo financing to Live Well.  Mirae did not know, nor could it have known, that asset values and financial results reported in those financial statements were based upon bond prices that the Criminal Insiders had fraudulently inflated.

86.     In making its credit decision, Mirae also reasonably relied upon the Criminal Insiders' misrepresentation that IDC served as an independent third-party pricing service that generated market prices for the bonds based upon objective market data and market conditions. To be sure, at that time, IDC was considered by many to be the market standard for pricing the kinds of illiquid securities at issue here, and Mirae could not have known that IDC had previously agreed to permit the Criminal Insiders to unilaterally set the bond prices.

87.     Based upon these fraudulent misrepresentations, Mirae began providing repo financing to Live Well in July 2017, backed by the overvalued bonds, and unwittingly became ensnared in the Criminal Insiders' fraudulent scheme

88.     At first, the Criminal Insiders used this new repo facility from Mirae to pay down Live Well's repo line of credit from Nomura by approximately $30 million because Mirae offered better financing terms and had agreed to use IDC prices to set bond values.  By August, however,

Wedbush began further reducing its exposure to the Live Well Bonds, and the new borrowing capacity Live Well had with Mirae would largely be earmarked to pay off Wedbush.

89.    If Wedbush had not previously been aware of the SEC's investigation into Live Well, upon information and belief, it was aware of the investigation by at least August 2017. On or around August 24, 2017, Scott Skyrm from Wedbush asked Rohr to speak with Wedbush's CFO regarding Live Well's repo financing. Rohr spoke with Wedbush's CFO the next day. During that call, Wedbush's CFO once again expressed concern about the valuations of the Live Well Bonds Wedbush was financing.

90.    Shortly thereafter, Wedbush, who by that time had started to purchase Live Well's bonds on 30-day repo terms, began to further reduce Live Well's repo-borrowing capacity. In August, Live Well repurchased bonds from Wedbush totaling approximately $12 million. By the end of September, Live Well had repurchased approximately $50 million more of the fraudulently inflated Live Well Bonds. And Live Well repurchased the remaining approximately $37 million worth of the fraudulently inflated Live Well Bonds from Wedbush by the end of October. Live Well borrowed the funds necessary to repurchase these bonds from Wedbush from its other repo lenders, including Mirae, based upon the fraudulently inflated bond prices the Criminal Insiders submitted to, and that were published by, IDC.

91.    Moreover, just as during the first quarter of 2017, Wedbush did not terminate its repo lending arrangement with Live Well all at once. Rather, Wedbush worked with Live Well to give it the time it needed to secure additional repo borrowing capacity with its other repo lenders to ensure that Wedbush would be repaid at the expense of Live Well's other repo lenders.

92.    From June 10, 2017 (*i.e.*, two years before Live Well's creditors filed an involuntary bankruptcy petition against Live Well) to the end of October 2017, Live Well made

the following transfers to, or for the benefit of, Wedbush (the "Fraudulent Transfers") to repurchase the Live Well Bonds owned by Wedbush and to pay Wedbush interest and fees in connection with the repo transactions:

| Date | Amount |
|---|---|
| 06/29/2017 | $18,718.33 |
| 7/7/2017 | $37,411.19 |
| 7/7/2017 | $123,471.91 |
| 7/21/2017 | $8,577.19 |
| 7/21/2017 | $549,000.00 |
| 7/31/2017 | $20,420.00 |
| 8/3/2017 | $135,990.63 |
| 8/3/2017 | $1,476,000.00 |
| 8/22/2017 | $20,000,000.00 |
| 8/31/2017 | $10,210,000.00 |
| 9/5/2017 | $19,342.28 |
| 9/5/2017 | $6,179,000.00 |
| 9/21/2017 | $8,815.63 |
| 9/21/2017 | $400,000.00 |
| 9/27/2017 | $214,000.00 |
| 9/27/2017 | $35,272,000.00 |
| 9/27/2017 | $59,947.59 |
| 9/29/2017 | $1,773.78 |
| 9/29/2017 | $7,982,000.00 |
| 10/5/2017 | $29,819.55 |
| 10/5/2017 | $33,547,000.00 |
| 10/20/2017 | $7,856.18 |
| 10/20/2017 | $4,150,000.00 |
| **TOTAL:** | **$120,450,544.26** |

93.     Each of these Fraudulent Transfers were made by Live Well with actual intent to hinder, delay, or defraud Live Well's present and future creditors, including Live Well's other repo lenders.  Indeed, the fraudulent intent of these transfers is presumed because the Criminal Insiders had turned Live Well into a *de facto* Ponzi scheme by using new repo loans backed by the fraudulently inflated values of the Live Well Bonds to generate the funds necessary to pay off its older repo lenders.  Each such transaction increased the amount by which Live Well's liabilities (both contractually and via increased civil liability to tort claims) exceeded the fair value of its

assets.  In other words, just like in a classic Ponzi scheme, Live Well and the Criminal Insiders used new money to pay off old debt in furtherance of, and in an effort to conceal, their fraud with knowledge that creditors would inevitably be harmed when the scheme eventually collapsed.

**VI.    The Fraud Is Revealed, Live Well Collapses into Bankruptcy, and the Criminal Insiders are Found Guilty.**

94.    As is inevitable with all such schemes, the house of cards built by the Criminal Insiders collapsed in spectacular fashion.  Although they managed to keep it going for a while longer by obtaining additional repo borrowing capacity from Mirae and others, by the spring of 2019, Live Well's remaining repo lenders, Flagstar, Mirae, and ICBC, had discovered Live Well's bonds were extremely overvalued and informed Live Well that they would stop financing the bonds.

95.    Because of the Criminal Insiders' fraud, Live Well did not have the liquidity to repay the repo lenders and could not find any new lenders to continue to perpetrate the fraud.  And the bonds could not be sold to pay the lenders because the market prices of the bonds were much lower than the amounts due to the lenders.

96.    Trying to avoid default, Hild sold one of Live Well's core legitimate businesses, its mortgage servicing business (together with certain other assets), at a fire-sale price of $64.6 million, causing Live Well to report a loss of $34.5 million on the sale in 2018.  The sale was an ill-fated effort to obtain much needed cash to keep the scheme going.  Not surprisingly, Hild's last-ditch attempt to save his scheme fell far short.

97.    As a result, on May 3, 2019, with the SEC and the DOJ finally closing in on the Criminal Insiders, Live Well wound down its operations and terminated all of its employees.

98.     On June 10, 2019 (the "Petition Date"), three of Live Well's repo lenders filed an involuntary chapter 7 petition against Live Well in the United States Bankruptcy Court for the District of Delaware.

99.     On July 1, 2019, an order for relief was entered and the Trustee was appointed to administer Live Well's bankruptcy estate.

100.    Live Well's creditors (excluding insiders) have asserted more than $110 million in claims.

101.    On August 29, 2019, the office of the United States Attorney for the Southern District of New York (the "U.S. Attorney") announced a five-count Indictment against Hild relating to the bond pricing scheme described herein, specifically: (i) conspiracy to commit securities fraud; (ii) conspiracy to commit wire fraud and bank fraud; (iii) securities fraud; (iv) wire fraud; and (v) bank fraud.

102.    On that same date, the U.S. Attorney's office announced that both Rohr and Stumberger had entered into plea agreements regarding their respective roles in the fraudulent bond price-fixing scheme and were cooperating with federal authorities.

103.    Rohr and Stumberger each admitted to participating in the scheme with Hild to defraud Live Well's repo lenders.

104.    As part of his plea allocution, Rohr stated, among other things:

> I agreed with others, including Michael Hild, the CEO of Live Well, to cause a third party, Pricing Service, to misrepresent the value of certain bonds to Live Well's counterparties and repurchase agreement transactions in order to induce the counterparties to purchase the bonds from Live Well for higher prices than they otherwise would have accepted or to induce the counterparties to loan more money to Live Well than they otherwise would have. . . .  I also agreed with Hild and others to provide misrepresentations from Live Well about the value of certain collateral in order to induce a federally insured bank to loan more money to Live Well than it otherwise would have.

105.    As part of his plea allocution, Stumberger stated, among other things:

> From 2015 until its bankruptcy in 2019, Live Well, at the direction of its CEO Michael Hild, submitted inflated valuations to IDC knowing that IDC was publishing those valuations in its database verbatim and expecting that Live Well's lenders would rely on those inflated valuations in making lending decisions.  Live Well's knowing publication of inflated valuations caused lenders to be less secure in their extension of credit to Live Well than they believed.  I was aware that Live Well was doing this.  I knew that it was wrong for Live Well to submit valuations that did not reflect the market value of the interest-only bonds in Live Well's portfolio . . . .

106.    Also on August 29, 2019, the SEC filed a civil complaint against Hild, Rohr, Stumberger, and Live Well seeking declaratory, injunctive, and other relief.

107.    On April 12, 2021, Hild went on trial in the United States District Court for the Southern District of New York.

108.    At the criminal trial, both Rohr and Stumberger testified, consistent with their plea allocutions, that they had participated in the scheme to defraud Live Well's repo lenders by inflating the values of the bonds and that Hild directed that scheme.

109.    On April 30, 2021, after a three-week trial and after less than four hours of deliberation, a jury unanimously found Hild guilty on all counts charged and specifically referenced above.

110.    That guilty verdict demonstrates beyond a reasonable doubt, as the government stated in its summation at the criminal trial, that:

> Michael Hild masterminded a deliberate scheme to defraud and deceive and mislead his lenders.  He tricked them into lending Live Well Financial hundreds of millions of dollars.  He hid from them the fact that what they thought were independent market values for the bonds that Live Well owned were in fact Live Well's own pie-in-the-sky prices, [p]rices that bore no relation to where you could sell the bonds in the market.  He used IDC as his puppet for years, pumping up prices when it suited him and never acknowledging that he was the one pulling the strings.
>
> Why did he do it?

You know the answer.  It was all about the money.  The defendant pocketed over $25 million from the scheme, and he continued to line his pockets even as the entire company was crumbling around him.

## CAUSES OF ACTION

### COUNT 1
### Avoidance of Actual Intent Fraudulent
### Transfer pursuant to 11 U.S.C. § 548(a)(1)(A)

111.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

112.    Within two years of the Petition Date—*i.e.*, from June 10, 2017, to June 10, 2019—Live Well made the following Fraudulent Transfers to or for the benefit of Wedbush:

| Date | Amount |
|------|--------|
| 06/29/2017 | $18,718.33 |
| 7/7/2017 | $37,411.19 |
| 7/7/2017 | $123,471.91 |
| 7/21/2017 | $8,577.19 |
| 7/21/2017 | $549,000.00 |
| 7/31/2017 | $20,420.00 |
| 8/3/2017 | $135,990.63 |
| 8/3/2017 | $1,476,000.00 |
| 8/22/2017 | $20,000,000.00 |
| 8/31/2017 | $10,210,000.00 |
| 9/5/2017 | $19,342.28 |
| 9/5/2017 | $6,179,000.00 |
| 9/21/2017 | $8,815.63 |
| 9/21/2017 | $400,000.00 |
| 9/27/2017 | $214,000.00 |
| 9/27/2017 | $35,272,000.00 |
| 9/27/2017 | $214,000.00 |
| 9/29/2017 | $1,773.78 |
| 9/29/2017 | $7,982,000.00 |
| 10/5/2017 | $29,819.55 |
| 10/5/2017 | $33,547,000.00 |
| 10/20/2017 | $7,856.18 |
| 10/20/2017 | $4,150,000.00 |
| **TOTAL:** | **$120,450,544.26** |

28

113.    In the alternative, and upon information and belief, the Fraudulent Transfers were made to or for the benefit of John Does 1–50.

114.    Live Well had an interest in the assets transferred by each of the Fraudulent Transfers.

115.    Each of the Fraudulent Transfers were made by Live Well with the actual intent to hinder, delay, or defraud Live Well's creditors because Live Well resorted to defrauding its other repo lenders to obtain the funds necessary to make the Fraudulent Transfers.  Moreover, as detailed above, the Fraudulent Transfers were made in furtherance of, and to conceal, the fraudulent price-fixing scheme perpetrated by the Criminal Insiders.

116.    Simply put, as a result of the fraudulent price-fixing scheme, Live Well's bond trading business had turned into a *de facto* Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims.  Also, just like a Ponzi scheme, Live Well's fraudulent bond trading business was doomed to fail, and take the company with it, because the value of Live Well's entire bond portfolio was, at all relevant times, fraudulently overstated and each of Live Well's repo lenders were materially undercollateralized on their repo loans.  As such, Live Well could not pay its obligations under its repo agreements by selling the bonds at market prices, and any failure by Live Well to secure the financing necessary to meet a repurchase demand from one of its repo lenders would, and inevitably did, result in the entire scheme collapsing.

117.    Accordingly, the Fraudulent Transfers are presumed to have been made with actual intent to hinder, delay, or defraud creditors.

118.    Moreover, as set forth in detail in this Complaint, Wedbush did not take any of the Fraudulent Transfers in good faith.

29

119.    Therefore, the Fraudulent Transfers are avoidable pursuant to 11 U.S.C. 548(a)(1)(A).

## COUNT 2
### Recovery of Avoidable Transfer 11 U.S.C. § 550(a)

120.    The Trustee repeats and realleges the allegations set forth above as if fully set forth herein.

121.    The Fraudulent Transfers are avoidable as actual intent fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) as alleged above.

122.    The Fraudulent Transfers were made to, or for the benefit of, Wedbush.  Thus, Wedbush was the initial transferee of the Fraudulent Transfers under 11 U.S.C. § 550(a)(1).

123.    Wedbush did not receive any of the Fraudulent Transfers in good faith.

124.    Accordingly, the Trustee is entitled to recover the Fraudulent Transfers (or the value thereof) pursuant to 11 U.S.C. § 550 from Wedbush as the initial transferee of the Fraudulent Transfers and John Does 1–50 as the subsequent transferees.  In the alternative, and to the extent any of the Fraudulent Transfers were made to or for the benefit of any of the John Does 1–50, the Trustee is entitled to recover the Fraudulent Transfers pursuant to 11 U.S.C. § 550 from such John Does as the initial transferees of such transfers.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that judgment be entered in his favor and against Defendants as follows:

a.    awarding monetary damages in an amount to be proven at trial, but not less than $120,450,544.26;

b.    awarding pre-judgment and post-judgement interest at the maximum rate permitted by law or equity;

c.      awarding reasonable attorney's fees and expenses, together with all costs of court;

d.      granting such other and further relief, at law or equity, as this Court deems just and proper.

Dated:  June 28, 2021

BLANK ROME LLP


/s/ *Stanley B. Tarr*
Michael B. Schaedle (*admitted pro hac vice*)
Stanley B. Tarr
BLANK ROME LLP
1201 N. Market Street, Suite 800
Wilmington, DE  19801
Tel: 302.425.6479
starr@blankrome.com

-and-

REID COLLINS & TSAI LLP

Eric D. Madden (*admitted pro hac vice*)
1601 Elm Street, Suite 4200
Dallas, Texas 75201
Tel: 214-420-8900
emadden@reidcollins.com

-and-

Gregory S. Schwegmann (*admitted pro hac vice*)
Morgan M. Menchaca (*pro hac vice to be filed*)
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy, Suite 300
Austin, Texas 78746
512.647.6100
gschwegmann@reidcollins.com
mmenchaca@reidcollins.com

*Attorneys for David W. Carickhoff,*
*as Chapter 7 Trustee of Live Well Financial,*
*Inc.*