# EXHIBIT A

Memorandum of Law in Support of Petitioner Darren Stumberger's Motion Pursuant to 28 U.S.C. § 2255, *United States v. Stumberger*, No. 19-cr-608 (RA) (S.D.N.Y. Sept. 10, 2026), ECF No. 49

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **DARREN STUMBERGER,**<br><br>**Petitioner,**<br><br>**-v.-**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Respondent.** | **26-cv-________ (RA)** |
| **UNITED STATES OF AMERICA,**<br><br>**-v.-**<br><br>**DARREN STUMBERGER,**<br><br>**Defendant.** | **19-cr-608 (RA)** |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER DARREN STUMBERGER'S MOTION PURSUANT TO 28 U.S.C. § 2255**

Dated: September 10, 2026
New York, New York

STEPTOE LLP

Julia Gatto
Drew C. Harris
1114 Avenue of the Americas
New York, NY 10036
(212) 378 7587 (telephone)
jgatto@steptoe.com

*Attorneys for Darren Stumberger*

Darren Stumberger ("Petitioner") files this memorandum of law to preserve claims arising from newly discovered evidence by setting forth his claims and their core factual bases. Petitioner will supplement this filing with an amended, full memorandum of law, a supporting declaration, and exhibits at a later date.

## I. BACKGROUND

On August 20, 2019, Petitioner and the government executed a plea agreement, pursuant to which Petitioner pleaded guilty to all five counts of the Information. Petitioner entered a guilty plea on August 27, 2019, before the Honorable Katharine H. Parker, United States Magistrate Judge, and that plea was accepted by Order of the Honorable J. Paul Oetken, United States District Judge. Pursuant to the plea agreement, Petitioner pleaded guilty to all five counts of the Information: Count One, conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; Count Two, conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349; Count Three, securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; Count Four, wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and Count Five, bank fraud, in violation of 18 U.S.C. § 1344.

On October 6, 2023, Petitioner was sentenced by the Honorable Ronnie Abrams to time served and three years of supervised release. Judgment was entered on October 10, 2023. Petitioner filed no direct appeal and has not previously filed any post-conviction motion or petition; this is his first motion under 28 U.S.C. § 2255. Petitioner remains under a term of supervised release through October 6, 2026, and is therefore "in custody" for purposes of § 2255. *See Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994) (holding that a person serving supervised release is "in custody" for purposes of § 2255).

## II. GROUNDS FOR RELIEF

Petitioner respectfully preserves the following grounds for relief and will develop the supporting record more fully in his forthcoming memorandum of law, declaration, and exhibits.

### A. GROUND ONE: Ineffective Assistance of Counsel — Failure to Investigate Available Defenses and Brady/Giglio Material, Resulting in Deficient Advice Regarding the Proffer Sessions and Guilty Plea

Petitioner's conviction should be vacated because his counsel, Robert Stern, provided constitutionally ineffective assistance by failing to explore or investigate available defenses and failing to request *Brady* and *Giglio* material, resulting in a failure to advise Petitioner concerning possible defenses to the charges against him.

*Background.* Petitioner joined Live Well Financial, Inc. ("Live Well" or the "Firm") as an Executive Vice President and trader, and was among the most experienced professionals in the market for Home Equity Conversion Mortgage interest-only ("HECM IO") bonds. Michael Hild, as Live Well's founder and principal, set the valuation assumptions and methodology used to value the company's HECM IO bond portfolio; Daniel Foster, a Vice President at Live Well, transmitted Live Well's valuation submissions to the portfolio's third-party pricing service, Interactive Data Corporation ("IDC"), at Hild's direction. Ernie Calabrese, a Senior Vice President, together with Eric Rohr, maintained the Firm's day-to-day relationships and discussions with its repo counterparties. Petitioner's own role was limited to executing trades and position hedges as directed by Hild; Petitioner was not an officer, was not a member of Live Well's Board of Directors, lacked authority over Live Well's relationships with its repo lenders, and had no role in margin decisions.

On two occasions — once in September 2015 and again in early 2017 — Petitioner, together with Foster and Ernie Calabrese, proactively sought outside legal advice from Todd

Gutfleish of Wechsler & Cohen regarding the valuation methodology; on neither occasion did counsel indicate that any criminal conduct was occurring.

Beginning in 2017, after Live Well received an SEC subpoena, and for approximately twenty-four consecutive months thereafter, valuations of Live Well's HECM IO bond portfolio were deliberately frozen and no adjustments were made to the valuations, a circumstance that was outside of Petitioner's control and not attributable to any decision by him. During this period, Petitioner repeatedly raised concerns to his attorneys, Robert Stern, Richard Morvillo, and Howard Altarescu (then at Orrick, Herrington & Sutcliffe), that the valuation freeze resulted in static valuations that no longer reflected changing conditions and asked whether it warranted revisiting; Orrick never responded or investigated the issue further. The Government treated the resulting divergence between these static valuations and other benchmarks as evidence of a prolonged scheme to maintain artificially inflated prices, without regard to the role that this extended period of unadjusted valuations — a period over which Petitioner had no control — may have played in creating that divergence, and which coincided with IDC's withdrawal from pricing the bonds and Foster's undisclosed submissions to Bloomberg.[1] Whether this period provided a legitimate, non-culpable explanation for the challenged valuations was never investigated by counsel, nor was the issue subjected to independent expert analysis, notwithstanding Petitioner's repeated requests.

On September 10, 2025 — more than six years after his plea, and through a channel entirely independent of his prior counsel or any government disclosure — Petitioner first learned of

---

[1] As Hild notes in his own habeas papers, the Government has acknowledged that the prices submitted to IDC remained static after Live Well received an SEC subpoena, "but does not clarify whether counsel advised Live Well to leave prices as-is in response to a subpoena." Reply Memorandum of Law in Support of Petitioner Michael Hild's Motion Pursuant to 28 U.S.C. § 2255 at 3 n.1, *United States v. Hild*, No. 19-cr-602 (RA) (KHP) (S.D.N.Y. Aug. 11, 2026), ECF No. 283.

evidence indicating that the very benchmark used to characterize Live Well's bond valuations as "inflated," a set of pricing data supplied to Bloomberg, had itself been compromised: it was supplied in material part by Daniel Foster, the same former Live Well employee who had helped create the Firm's methodology, was simultaneously cooperating with the SEC and the SDNY, and seeking, and ultimately obtaining, a non-prosecution agreement. After leaving Live Well, Foster joined Robert W. Baird & Co., through which he became a recurring pricing contributor to Bloomberg for the same HECM IO securities, proposing a paid data-acquisition arrangement with Bloomberg at a time Bloomberg has acknowledged being "starved for data" in this sector. Petitioner also learned of related evidence indicating that IDC, the Firm's prior pricing service, had ceased accepting Live Well's valuations amid its own regulatory scrutiny. This evidence bears directly on the theories on which the government charged Petitioner, based on which he pleaded guilty.

*Discussion.* Counsel never investigated or discussed with Petitioner the defenses and impeachment material available to Petitioner, including with respect to the IDC-to-Bloomberg benchmark transition, Dan Foster's simultaneous role as a Bloomberg pricing contributor and government cooperator, the opinion provided by Wechsler & Cohen, Robert W. Baird & Co.'s data-acquisition relationship with Bloomberg, or the twenty-four-month freeze during which the bond portfolio's valuations went unadjusted — nor did counsel retain an independent bond-valuation expert. Counsel's failure to investigate fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) (counsel has a duty to make reasonable investigations or a reasonable decision that particular investigations are unnecessary); *Wiggins v. Smith*, 539 U.S. 510, 521–27 (2003) (reasonableness depends on both existing evidence and whether it would lead a reasonable attorney to investigate further). And a

decision not to investigate is entitled to no deference where, as here, it did not follow from reasoned professional judgment after adequate inquiry. *See Parisi v. United States*, 529 F.3d 134, 140–41 (2d Cir. 2008) (requiring courts to assess counsel's performance under prevailing professional norms based on the circumstances counsel faced at the time).[2]

*Prejudice.* But for counsel's failure to investigate and to advise Petitioner of available defenses, there is a reasonable probability that Petitioner would not have pleaded guilty, including because he would have understood that viable valuation and advice-of-counsel defenses existed, and that *Brady/Giglio* material bearing on Foster's credibility was available.

### B. GROUND TWO: Ineffective Assistance of Counsel — Deficient Advice Regarding Proffer Sessions and Guilty Plea

Petitioner's conviction should be vacated because counsel compelled him to enter into a "proffer and cooperate" path that led directly to his guilty plea, the foreseeable collateral consequences of which counsel also did not identify for Petitioner.

*Background.* Petitioner was a subject of a U.S. Securities and Exchange Commission ("SEC") investigation into Live Well arising from the bond valuations at issue. Although Petitioner was formally a subject of that investigation, Orrick never explained this status to Petitioner or what it meant for his rights and options; counsel's guidance was instead limited to directing Petitioner to cooperate, decline to defend himself or offer his own truthful account, and adopt the government's narrative as a means of avoiding civil charges. Petitioner had asked to

---

[2] Petitioner's claim is not foreclosed by *United States v. Ruiz*, 536 U.S. 622, 629 (2002), which addresses only the Government's pre-plea obligation to disclose impeachment material, nor by the plea agreement's waiver of claims on the ground that the Government "failed to produce" discovery, *Brady*, or Jencks Act material. By its terms, that waiver applies only to the Government's non-production; it does not reach a claim that defense counsel unreasonably failed to request or conduct an independent investigation of material reasonably available to a diligent advocate. It also explicitly carves out *Giglio* material or information establishing factual innocence.

leave Live Well as early as late 2017 and throughout 2018, including in discussions with Orrick and directly with SEC staff, but was told that he needed to remain at the Firm to continue assisting the investigation.

Petitioner understood in or around May 2019 that the SEC investigation would resolve without civil charges so long as he continued to cooperate, and the SEC had executed a Deferred Prosecution Agreement ("DPA") with him to that effect.[3] Petitioner was, however, ultimately named with others in a civil enforcement action brought by the SEC. Petitioner consented to the entry of a judgment imposing injunctive relief in October 2019, and the Court entered a final judgment resolving monetary relief in 2025. That civil resolution proceeded in parallel with the criminal prosecution of Petitioner by the U.S. Attorney's Office for the Southern District of New York ("SDNY").

In connection with the SDNY matter, Petitioner participated in proffer sessions with Assistant U.S. Attorneys Scott Hartman and Jordan Estes and FBI agents on June 14, July 3, and July 24, 2019, pursuant to a proffer agreement — not an immunity agreement. Petitioner was repeatedly instructed by his counsel at Orrick to "take ownership" of the government's narrative of events rather than to offer his own independent, truthful account. On at least one occasion, AUSA Hartman raised his voice and used profanity when Petitioner's account diverged from the government's theory. Stern did not substantively review the facts or the government's document binder with Petitioner in advance of the sessions, did not explain the mechanics of proffer sessions, the possibility of derivative use of proffer statements, or Petitioner's right to offer his own account,

[3] Though counsel has not yet obtained a copy of the DPA, Petitioner's account is consistent with Stern's professional biography, which lists among his "Representative SEC Enforcement Experience" that he "[o]btained a DPA from the SEC for a head of mortgage trading desk in connection with an enforcement matter." Weil, Gotshal & Manges LLP, *Robert Stern*, https://www.weil.com/people/robert-stern (last visited Sept. 10, 2026).

and did not advise Petitioner that his participation in the proffer sessions was voluntary or that he could instead proceed to trial. And Petitioner was confronted for the first time, on the record, with much of the government's documentary evidence during the sessions themselves.

On August 20, 2019, Petitioner and the government executed the plea agreement, pursuant to which Petitioner pleaded guilty to all five counts of the Information. Counsel never advised Petitioner of the likely collateral consequences of his plea, including in related civil litigation.

*Discussion.* Rather than advise Petitioner as to the various strategic options available to him, Counsel instead instructed Petitioner to "cooperate fully" and "adopt the government's narrative" during the proffer sessions, representing that doing so would avoid criminal charges, and never advised Petitioner that proffer participation was voluntary or that he could instead proceed to trial. *See Hill v. Lockhart*, 474 U.S. 52, 55–59 (1985) (applying *Strickland's* two-part test to challenges to guilty pleas, under which a petitioner must show both that counsel's advice fell below the range of competence demanded of attorneys in criminal cases and that there is a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have proceeded to trial); *Missouri v. Frye*, 566 U.S. 134, 144 (2012) (ineffective assistance during plea negotiations may deprive a defendant of meaningful legal representation at a critical stage of the proceedings). Counsel also never advised Petitioner of the foreseeable civil-litigation consequences of his plea. *See Padilla v. Kentucky*, 559 U.S. 356, 364, 373–74 (2010) (counsel's failure to advise regarding a readily ascertainable direct consequence of a guilty plea may constitute constitutionally deficient performance); *Lee v. United States*, 582 U.S. 357, 367 (2017) (a defendant's decision whether to plead guilty depends not only on the likelihood of success at trial, but also on the relative consequences of a plea and a conviction after trial).

Moreover, counsel advised Petitioner to remain at Live Well despite his desire to leave, lengthening his tenure there during the charged scheme.

*Prejudice.* But for counsel's deficient advice, there is a reasonable probability that Petitioner would not have remained at Live Well as long as he did, and would not have pleaded guilty, including because he would have had less involvement in the charged conduct and would have understood that viable defenses existed and that the plea carried a significant foreseeable risk of additional legal exposure in related litigation. *Hill*, 474 U.S. at 59.

### C. GROUND THREE: Petitioner's Guilty Plea Was Rendered Involuntary by Counsel's Coercive Conduct

*Discussion.* Approximately one week before Petitioner's plea, counsel demanded a $400,000 payment, threatening to withdraw if payment was not made. On the morning of the hearing, counsel discarded Petitioner's own draft allocution in favor of an unattributed script. During an off-record pause in the plea colloquy — after Petitioner had initially answered "No" when asked whether he had an agreement with another person to commit the charged frauds — counsel muted the microphone and threatened Petitioner, including with the prospect of immediate custody, unless he changed his answer, which he then did. Following the plea, counsel ceased communication with Petitioner, confirming that counsel's objective was to obtain the $400,000 payment and engineer the quickest possible end to counsel's engagement by Mr. Stumberger — which led counsel to steer Mr. Stumberger into a guilty plea, rather than a resource-intensive trial.

*Prejudice.* But for counsel's threats, coercion, and deficient advice, Petitioner would not have entered into the plea and would have proceeded to trial.

## III. TIMELINESS

This motion is timely under 28 U.S.C. § 2255(f)(4) and under the doctrine of equitable tolling. Petitioner respectfully preserves both theories and will develop the supporting record more fully in the forthcoming memorandum of law, declaration, and exhibits.[4]

### A. Background

Petitioner's relationship with Stern and Orrick deteriorated after the plea; the firm later sought to withdraw and the representation dissolved in or around March 2020, and a 2021 fee dispute with the firm was resolved with a partial refund to Petitioner. FBI Special Agent Brandon Racz referred Petitioner to successor counsel, Xavier Donaldson, who was appointed under the Criminal Justice Act. Over the following six years, Donaldson failed to substantively discuss potential post-conviction remedies with Petitioner, failed to assist him with obtaining case documents, was absent during Petitioner's three-day testimony in the *Hild* trial, and, in 2025 and 2026, sent Petitioner written communications that Petitioner experienced as warning him against suggesting his plea had been involuntary and as invoking his children in doing so. On June 29, 2026, Petitioner emailed this Court directly; the Court removed Donaldson from the case that same day and appointed current counsel.

Petitioner is party to other, civil matters, in which he is represented *pro se*, including *Flagstar Bank* v. *Hild, et al.*, No. 19-cv-11512 (E.D. Mich.), a suit by a former Live Well lender naming Petitioner among other defendants, and *Carickhoff v. Hild et al.*, Adv. Pro. No. 21-50966 (LSS) (D. Del. Bankr.), an adversary proceeding arising from the Live Well's bankruptcy. Mr.

---

[4] *See* Fed. R. Civ. P. 15; *Mayle v. Felix*, 545 U.S. 644, 650, 657, 664 (2005) (an amendment to a habeas motion relates back when it shares a "common core of operative facts" with a timely asserted claim, rather than merely arising from the same conviction or proceeding).

Stumberger does not receive all docket filings from either case and lacks direct access to the case dockets.

**B. Newly Discovered Facts**

Petitioner's motion is timely under 28 U.S.C. § 2255(f)(4) and preserves claims arising from newly discovered evidence. The evidence was discovered on September 10, 2025; despite due diligence, the underlying facts could not reasonably have been discovered before September 10, 2025, because the Foster/Bloomberg pricing relationship was never disclosed to Petitioner and first came to light only through Petitioner's review of a filing in *Flagstar Bank v. Hild, et al.*, which described the pricing relationship.

**C. Equitable Tolling**

Independently, and in the alternative, equitable tolling is warranted to the extent necessary. Petitioner's appointed CJA counsel, Xavier Donaldson, was unavailable to Petitioner for approximately six years — including throughout the twelve months following Petitioner's discovery of the newly discovered evidence described above — and informed Petitioner that he was conflicted and unable to assist with the instant motion, leading to his replacement by this Court on June 29, 2026, notwithstanding Petitioner's repeated, diligent efforts to obtain his assistance. Petitioner respectfully submits that these circumstances constitute the type of extraordinary attorney abandonment warranting equitable tolling. *See Maples v. Thomas*, 565 U.S. 266 (2012) (attorney misconduct may constitute an extraordinary circumstance warranting equitable tolling where counsel's failures exceed mere negligence); *Holland v. Florida*, 560 U.S. 631, 651–53 (2010) (serious attorney misconduct may constitute an extraordinary circumstance warranting equitable tolling).

## IV. RELIEF REQUESTED

For the foregoing reasons, Petitioner respectfully requests that this Court grant his motion pursuant to 28 U.S.C. § 2255 and vacate his conviction and sentence. In the alternative, Petitioner respectfully requests that the Court grant Petitioner leave to conduct targeted discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings — including document discovery and depositions directed to Dan Foster, Bloomberg, Wechsler & Cohen, Robert W. Baird & Co., Murphy & McGonigle, Petitioner's former counsel Robert Stern, Richard Morvillo, and Xavier Donaldson, and the government — and hold an evidentiary hearing pursuant to 28 U.S.C. § 2255(b). *See Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997) (where specific allegations give reason to believe a petitioner may be entitled to relief if the facts are fully developed, the court must provide an adequate opportunity for factual inquiry); *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (an evidentiary hearing is required where a petitioner presents a plausible claim of ineffective assistance that is not conclusively refuted by the record).

Petitioner will supplement this filing with an amended memorandum of law, declaration, and supporting exhibits.

Dated: September 10, 2026
New York, New York

Respectfully submitted,

*/s/ Julia Gatto*
Julia Gatto
Drew C. Harris
STEPTOE LLP

*Attorneys for Darren Stumberger*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, the undersigned counsel certifies that the foregoing memorandum complies with the formatting requirements of Local Civil Rule 7.1(b) in that it has been prepared in a proportionally spaced 12-point typeface (Times New Roman), with one-inch margins on all sides and double-spaced text.

The undersigned further certifies that, according to the word-processing system used to prepare this memorandum, the memorandum contains 3,419 words, exclusive of the caption, signature blocks, and this certificate, and therefore complies with the 8,750-word limitation of Local Civil Rule 7.1(c).

Dated: September 10, 2026
New York, New York

*/s/ Julia Gatto*
Julia Gatto